# HERRERA *v.* COLLINS, DIRECTOR, TEXAS DEPARTMENT OF CRIMINAL JUSTICE, INSTITUTIONAL DIVISION

No. 91–7328.   Argued October 7, 1992—Decided January 25, 1993

REHNQUIST, C. J., delivered the opinion of the Court, in which O'CON-NOR, SCALIA, KENNEDY, and THOMAS, JJ., joined. O'CONNOR, J., filed a concurring opinion, in which KENNEDY, J., joined, *post*, p. 419. SCALIA, J., filed a concurring opinion, in which THOMAS, J., joined, *post*, p. 427. WHITE, J., filed an opinion concurring in the judgment, *post*, p. 429. BLACK-MUN, J., filed a dissenting opinion, in Parts I, II, III, and IV of which STEVENS and SOUTER, JJ., joined, *post*, p. 430.

*Talbot D'Alemberte* argued the cause for petitioner. With him on the brief were *Robert L. McGlasson, Phyllis L. Crocker,* and *Mark Evan Olive.*

*Margaret Portman Griffey,* Assistant Attorney General of Texas, argued the cause for respondent. With her on the brief were *Dan Morales,* Attorney General, *Will Pryor,* First Assistant Attorney General, *Mary F. Keller,* Deputy Attorney General, and *Michael P. Hodge, Dana E. Parker,* and *Joan C. Barton,* Assistant Attorneys General.

*Paul J. Larkin, Jr.,* argued the cause for the United States as *amicus curiae* urging affirmance. With him on the brief were *Solicitor General Starr, Assistant Attorney General Mueller,* and *Deputy Solicitor General Roberts.*

CHIEF JUSTICE REHNQUIST delivered the opinion of the Court.

Petitioner Leonel Torres Herrera was convicted of capital murder and sentenced to death in January 1982. He unsuccessfully challenged the conviction on direct appeal and state collateral proceedings in the Texas state courts, and in a federal habeas petition. In February 1992—10 years after his conviction—he urged in a second federal habeas petition that he was "actually innocent" of the murder for which he was sentenced to death, and that the Eighth Amendment's prohibition against cruel and unusual punishment and the Fourteenth Amendment's guarantee of due process of law therefore forbid his execution. He supported this claim with affidavits tending to show that his now-dead brother, rather than he, had been the perpetrator of the crime. Petitioner urges us to hold that this showing of innocence entitles him to relief in this federal habeas proceeding. We hold that it does not.

Shortly before 11 p.m. on an evening in late September 1981, the body of Texas Department of Public Safety Officer David Rucker was found by a passer-by on a stretch of highway about six miles east of Los Fresnos, Texas, a few miles north of Brownsville in the Rio Grande Valley. Rucker's body was lying beside his patrol car. He had been shot in the head.

At about the same time, Los Fresnos Police Officer Enrique Carrisalez observed a speeding vehicle traveling west towards Los Fresnos, away from the place where Rucker's body had been found, along the same road. Carrisalez, who was accompanied in his patrol car by Enrique Hernandez, turned on his flashing red lights and pursued the speeding

vehicle. After the car had stopped briefly at a red light, it signaled that it would pull over and did so. The patrol car pulled up behind it. Carrisalez took a flashlight and walked toward the car of the speeder. The driver opened his door and exchanged a few words with Carrisalez before firing at least one shot at Carrisalez' chest. The officer died nine days later.

Petitioner Herrera was arrested a few days after the shootings and charged with the capital murder of both Carrisalez and Rucker. He was tried and found guilty of the capital murder of Carrisalez in January 1982, and sentenced to death. In July 1982, petitioner pleaded guilty to the murder of Rucker.

At petitioner's trial for the murder of Carrisalez, Hernandez, who had witnessed Carrisalez' slaying from the officer's patrol car, identified petitioner as the person who had wielded the gun. A declaration by Officer Carrisalez to the same effect, made while he was in the hospital, was also admitted. Through a license plate check, it was shown that the speeding car involved in Carrisalez' murder was registered to petitioner's "live-in" girlfriend. Petitioner was known to drive this car, and he had a set of keys to the car in his pants pocket when he was arrested. Hernandez identified the car as the vehicle from which the murderer had emerged to fire the fatal shot. He also testified that there had been only one person in the car that night.

The evidence showed that Herrera's Social Security card had been found alongside Rucker's patrol car on the night he was killed. Splatters of blood on the car identified as the vehicle involved in the shootings, and on petitioner's blue jeans and wallet were identified as type A blood—the same type which Rucker had. (Herrera has type O blood.) Similar evidence with respect to strands of hair found in the car indicated that the hair was Rucker's and not Herrera's. A handwritten letter was also found on the person of petitioner

when he was arrested, which strongly implied that he had killed Rucker.[1]

Petitioner appealed his conviction and sentence, arguing, among other things, that Hernandez' and Carrisalez' identifications were unreliable and improperly admitted. The Texas Court of Criminal Appeals affirmed, *Herrera v. State*, 682 S. W. 2d 313 (1984), and we denied certiorari, 471 U. S. 1131 (1985). Petitioner's application for state habeas relief was denied. *Ex parte Herrera*, No. 12,848-02 (Tex. Crim. App., Aug. 2, 1985). Petitioner then filed a federal habeas

---

[1] The letter read: "To whom it may concern: I am terribly sorry for those I have brought grief to their lives. Who knows why? We cannot change the future's problems with problems from the past. What I did was for a cause and purpose. One law runs others, and in the world we live in, that's the way it is.

"I'm not a tormented person. . . . I believe in the law. What would it be without this [sic] men that risk their lives for others, and that's what they should be doing—protecting life, property, and the pursuit of happiness. Sometimes, the law gets too involved with other things that profit them. The most laws that they make for people to break them, in other words, to encourage crime.

"What happened to Rucker was for a certain reason. I knew him as Mike Tatum. He was in my business, and he violated some of its laws and suffered the penalty, like the one you have for me when the time comes.

"My personal life, which has been a conspiracy since my high school days, has nothing to do with what has happened. The other officer that became part of our lives, me and Rucker's (Tatum), that night had not to do in this [sic]. He was out to do what he had to do, protect, but that's life. There's a lot of us that wear different faces in lives every day, and that is what causes problems for all. [Unintelligible word].

"You have wrote all you want of my life, but think about yours, also. [Signed Leonel Herrera].

"I have tapes and pictures to prove what I have said. I will prove my side if you accept to listen. You [unintelligible word] freedom of speech, even a criminal has that right. I will present myself if this is read word for word over the media, I will turn myself in; if not, don't have millions of men out there working just on me while others—robbers, rapists, or burglars—are taking advantage of the law's time. Excuse my spelling and writing. It's hard at times like this." App. to Brief for United States as *Amicus Curiae* 3a–4a.

petition, again challenging the identifications offered against him at trial. This petition was denied, see 904 F. 2d 944 (CA5), and we again denied certiorari, 498 U. S. 925 (1990).

Petitioner next returned to state court and filed a second habeas petition, raising, among other things, a claim of "actual innocence" based on newly discovered evidence. In support of this claim petitioner presented the affidavits of Hector Villarreal, an attorney who had represented petitioner's brother, Raul Herrera, Sr., and of Juan Franco Palacious, one of Raul, Senior's former cellmates. Both individuals claimed that Raul, Senior, who died in 1984, had told them that he—and not petitioner—had killed Officers Rucker and Carrisalez.[2] The State District Court denied this application, finding that "no evidence at trial remotely suggest[ed] that anyone other than [petitioner] committed the offense." *Ex parte Herrera*, No. 81–CR–672–C (Tex. 197th Jud. Dist., Jan. 14, 1991), ¶ 35. The Texas Court of Criminal Appeals affirmed, *Ex parte Herrera*, 819 S. W. 2d 528 (1991), and we denied certiorari, *Herrera* v. *Texas*, 502 U. S. 1085 (1992).

In February 1992, petitioner lodged the instant habeas petition—his second—in federal court, alleging, among other things, that he is innocent of the murders of Rucker and Carrisalez, and that his execution would thus violate the Eighth

---

[2] Villarreal's affidavit is dated December 11, 1990. He attested that while he was representing Raul, Senior, on a charge of attempted murder in 1984, Raul, Senior, had told him that he, petitioner, their father, Officer Rucker, and the Hidalgo County Sheriff were involved in a drug-trafficking scheme; that he was the one who had shot Officers Rucker and Carrisalez; that he did not tell anyone about this because he thought petitioner would be acquitted; and that after petitioner was convicted and sentenced to death, he began blackmailing the Hidalgo County Sheriff. According to Villarreal, Raul, Senior, was killed by Jose Lopez, who worked with the sheriff on drug-trafficking matters and was present when Raul, Senior, murdered Rucker and Carrisalez, to silence him.

Palacious' affidavit is dated December 10, 1990. He attested that while he and Raul, Senior, shared a cell together in the Hidalgo County jail in 1984, Raul, Senior, told him that he had shot Rucker and Carrisalez.

and Fourteenth Amendments. In addition to proffering the above affidavits, petitioner presented the affidavits of Raul Herrera, Jr., Raul, Senior's son, and Jose Ybarra, Jr., a schoolmate of the Herrera brothers. Raul, Junior, averred that he had witnessed his father shoot Officers Rucker and Carrisalez and petitioner was not present. Raul, Junior, was nine years old at the time of the killings. Ybarra alleged that Raul, Senior, told him one summer night in 1983 that he had shot the two police officers.[3] Petitioner alleged that law enforcement officials were aware of this evidence, and had withheld it in violation of *Brady* v. *Maryland*, 373 U. S. 83 (1963).

The District Court dismissed most of petitioner's claims as an abuse of the writ. No. M–92–30 (SD Tex., Feb. 17, 1992). However, "in order to ensure that Petitioner can assert his constitutional claims and out of a sense of fairness and due process," the District Court granted petitioner's request for a stay of execution so that he could present his claim of actual innocence, along with the Raul, Junior, and Ybarra affidavits, in state court. App. 38–39. Although it initially dismissed petitioner's *Brady* claim on the ground that petitioner had failed to present "any evidence of withholding exculpatory material by the prosecution," App. 37, the District Court also granted an evidentiary hearing on this claim after reconsideration, *id.*, at 54.

The Court of Appeals vacated the stay of execution. 954 F. 2d 1029 (CA5 1992). It agreed with the District Court's initial conclusion that there was no evidentiary basis for petitioner's *Brady* claim, and found disingenuous petitioner's attempt to couch his claim of actual innocence in *Brady* terms. 954 F. 2d, at 1032. Absent an accompanying constitutional violation, the Court of Appeals held that petitioner's claim

---

[3] Raul, Junior's affidavit is dated January 29, 1992. Ybarra's affidavit is dated January 9, 1991. It was initially submitted with Petitioner's Reply to State's Brief in Response to Petitioner's Petition for Writ of Habeas Corpus filed January 18, 1991, in the Texas Court of Criminal Appeals.

of actual innocence was not cognizable because, under *Townsend* v. *Sain,* 372 U. S. 293, 317 (1963), "the existence merely of newly discovered evidence relevant to the guilt of a state prisoner is not a ground for relief on federal habeas corpus." See 954 F. 2d, at 1034.[4] We granted certiorari, 502 U. S. 1085 (1992), and the Texas Court of Criminal Appeals stayed petitioner's execution. We now affirm.

Petitioner asserts that the Eighth and Fourteenth Amendments to the United States Constitution prohibit the execution of a person who is innocent of the crime for which he was convicted. This proposition has an elemental appeal, as would the similar proposition that the Constitution prohibits the imprisonment of one who is innocent of the crime for which he was convicted. After all, the central purpose of any system of criminal justice is to convict the guilty and free the innocent. See *United States* v. *Nobles,* 422 U. S. 225, 230 (1975). But the evidence upon which petitioner's claim of innocence rests was not produced at his trial, but rather eight years later. In any system of criminal justice, "innocence" or "guilt" must be determined in some sort of a judicial proceeding. Petitioner's showing of innocence, and indeed his constitutional claim for relief based upon that showing, must be evaluated in the light of the previous proceedings in this case, which have stretched over a span of 10 years.

A person when first charged with a crime is entitled to a presumption of innocence, and may insist that his guilt be established beyond a reasonable doubt. *In re Winship,* 397 U. S. 358 (1970). Other constitutional provisions also have the effect of ensuring against the risk of convicting an inno-

---

[4] After the Court of Appeals vacated the stay of execution, petitioner attached a new affidavit by Raul, Junior, to his petition for rehearing, which was denied. The affidavit alleges that during petitioner's trial, various law enforcement officials and the Hidalgo County Sheriff told Raul, Junior, not to say what happened on the night of the shootings and threatened his family.

cent person. See, *e. g., Coy* v. *Iowa,* 487 U. S. 1012 (1988) (right to confront adverse witnesses); *Taylor* v. *Illinois,* 484 U. S. 400 (1988) (right to compulsory process); *Strickland* v. *Washington,* 466 U. S. 668 (1984) (right to effective assistance of counsel); *Winship, supra* (prosecution must prove guilt beyond a reasonable doubt); *Duncan* v. *Louisiana,* 391 U. S. 145 (1968) (right to jury trial); *Brady* v. *Maryland, supra* (prosecution must disclose exculpatory evidence); *Gideon* v. *Wainwright,* 372 U. S. 335 (1963) (right to assistance of counsel); *In re Murchison,* 349 U. S. 133, 136 (1955) (right to "fair trial in a fair tribunal"). In capital cases, we have required additional protections because of the nature of the penalty at stake. See, *e. g., Beck* v. *Alabama,* 447 U. S. 625 (1980) (jury must be given option of convicting the defendant of a lesser offense). All of these constitutional safeguards, of course, make it more difficult for the State to rebut and finally overturn the presumption of innocence which attaches to every criminal defendant. But we have also observed that "[d]ue process does not require that every conceivable step be taken, at whatever cost, to eliminate the possibility of convicting an innocent person." *Patterson* v. *New York,* 432 U. S. 197, 208 (1977). To conclude otherwise would all but paralyze our system for enforcement of the criminal law.

Once a defendant has been afforded a fair trial and convicted of the offense for which he was charged, the presumption of innocence disappears. Cf. *Ross* v. *Moffitt,* 417 U. S. 600, 610 (1974) ("The purpose of the trial stage from the State's point of view is to convert a criminal defendant from a person presumed innocent to one found guilty beyond a reasonable doubt"). Here, it is not disputed that the State met its burden of proving at trial that petitioner was guilty of the capital murder of Officer Carrisalez beyond a reasonable doubt. Thus, in the eyes of the law, petitioner does not come before the Court as one who is "innocent," but, on the

contrary, as one who has been convicted by due process of law of two brutal murders.

Based on affidavits here filed, petitioner claims that evidence never presented to the trial court proves him innocent notwithstanding the verdict reached at his trial. Such a claim is not cognizable in the state courts of Texas. For to obtain a new trial based on newly discovered evidence, a defendant must file a motion within 30 days after imposition or suspension of sentence. Tex. Rule App. Proc. 31(a)(1) (1992). The Texas courts have construed this 30-day time limit as jurisdictional. See *Beathard* v. *State,* 767 S. W. 2d 423, 433 (Tex. Crim. App. 1989); *Drew* v. *State,* 743 S. W. 2d 207, 222–223 (Tex. Crim. App. 1987).

Claims of actual innocence based on newly discovered evidence have never been held to state a ground for federal habeas relief absent an independent constitutional violation occurring in the underlying state criminal proceeding. Chief Justice Warren made this clear in *Townsend* v. *Sain, supra,* at 317 (emphasis added):

> "Where newly discovered evidence is alleged in a habeas application, evidence which could not reasonably have been presented to the state trier of facts, the federal court must grant an evidentiary hearing. Of course, such evidence must bear upon the constitutionality of the applicant's detention; *the existence merely of newly discovered evidence relevant to the guilt of a state prisoner is not a ground for relief on federal habeas corpus.*"

This rule is grounded in the principle that federal habeas courts sit to ensure that individuals are not imprisoned in violation of the Constitution—not to correct errors of fact. See, *e. g., Moore* v. *Dempsey,* 261 U. S. 86, 87–88 (1923) (Holmes, J.) ("[W]hat we have to deal with [on habeas review] is not the petitioners' innocence or guilt but solely the question whether their constitutional rights have been pre-

served"); *Hyde* v. *Shine*, 199 U. S. 62, 84 (1905) ("[I]t is well settled that upon *habeas corpus* the court will not weigh the evidence") (emphasis in original); *Ex parte Terry*, 128 U. S. 289, 305 (1888) ("As the writ of *habeas corpus* does not perform the office of a writ of error or an appeal, [the facts establishing guilt] cannot be re-examined or reviewed in this collateral proceeding") (emphasis in original).

More recent authority construing federal habeas statutes speaks in a similar vein. "Federal courts are not forums in which to relitigate state trials." *Barefoot* v. *Estelle*, 463 U. S. 880, 887 (1983). The guilt or innocence determination in state criminal trials is "a decisive and portentous event." *Wainwright* v. *Sykes*, 433 U. S. 72, 90 (1977). "Society's resources have been concentrated at that time and place in order to decide, within the limits of human fallibility, the question of guilt or innocence of one of its citizens." *Ibid.* Few rulings would be more disruptive of our federal system than to provide for federal habeas review of freestanding claims of actual innocence.

Our decision in *Jackson* v. *Virginia*, 443 U. S. 307 (1979), comes as close to authorizing evidentiary review of a state-court conviction on federal habeas as any of our cases. There, we held that a federal habeas court may review a claim that the evidence adduced at a state trial was not sufficient to convict a criminal defendant beyond a reasonable doubt. But in so holding, we emphasized:

> "[T]his inquiry does not require a court to 'ask itself whether *it* believes that the evidence at the trial established guilt beyond a reasonable doubt.' Instead, the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. This familiar standard gives full play to the responsibility of the trier of fact fairly to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable

inferences from basic facts to ultimate facts." *Id.*, at 318–319 (citations omitted; emphasis in original).

We specifically noted that "the standard announced . . . does not permit a court to make its own subjective determination of guilt or innocence." *Id.*, at 320, n. 13.

The type of federal habeas review sought by petitioner here is different in critical respects than that authorized by *Jackson.* First, the *Jackson* inquiry is aimed at determining whether there has been an independent constitutional violation—*i. e.*, a conviction based on evidence that fails to meet the *Winship* standard. Thus, federal habeas courts act in their historic capacity—to assure that the habeas petitioner is not being held in violation of his or her federal constitutional rights. Second, the sufficiency of the evidence review authorized by *Jackson* is limited to "record evidence." 443 U. S., at 318. *Jackson* does not extend to non-record evidence, including newly discovered evidence. Finally, the *Jackson* inquiry does not focus on whether the trier of fact made the *correct* guilt or innocence determination, but rather whether it made a *rational* decision to convict or acquit.

Petitioner is understandably imprecise in describing the sort of federal relief to which a suitable showing of actual innocence would entitle him. In his brief he states that the federal habeas court should have "an important initial opportunity to hear the evidence and resolve the merits of Petitioner's claim." Brief for Petitioner 42. Acceptance of this view would presumably require the habeas court to hear testimony from the witnesses who testified at trial as well as those who made the statements in the affidavits which petitioner has presented, and to determine anew whether or not petitioner is guilty of the murder of Officer Carrisalez. Indeed, the dissent's approach differs little from that hypothesized here.

The dissent would place the burden on petitioner to show that he is "probably" innocent. *Post,* at 442. Although

petitioner would not be entitled to discovery "as a matter of right," the District Court would retain its "discretion to order discovery . . . when it would help the court make a reliable determination with respect to the prisoner's claim." *Post*, at 444. And although the District Court would not be required to hear testimony from the witnesses who testified at trial or the affiants upon whom petitioner relies, the dissent would allow the District Court to do so "if the petition warrants a hearing." *Ibid.* At the end of the day, the dissent would have the District Court "make a case-by-case determination about the reliability of the newly discovered evidence under the circumstances," and then "weigh the evidence in favor of the prisoner against the evidence of his guilt." *Post*, at 443.

The dissent fails to articulate the relief that would be available if petitioner were to meets its "probable innocence" standard. Would it be commutation of petitioner's death sentence, new trial, or unconditional release from imprisonment? The typical relief granted in federal habeas corpus is a conditional order of release unless the State elects to retry the successful habeas petitioner, or in a capital case a similar conditional order vacating the death sentence. Were petitioner to satisfy the dissent's "probable innocence" standard, therefore, the District Court would presumably be required to grant a conditional order of relief, which would in effect require the State to retry petitioner 10 years after his first trial, not because of any constitutional violation which had occurred at the first trial, but simply because of a belief that in light of petitioner's new-found evidence a jury might find him not guilty at a second trial.

Yet there is no guarantee that the guilt or innocence determination would be any more exact. To the contrary, the passage of time only diminishes the reliability of criminal adjudications. See *McCleskey* v. *Zant*, 499 U. S. 467, 491 (1991) ("[W]hen a habeas petitioner succeeds in obtaining a new trial, the 'erosion of memory and dispersion of witnesses

that occur with the passage of time' prejudice the government and diminish the chances of a reliable criminal adjudication") (quoting *Kuhlmann* v. *Wilson,* 477 U. S. 436, 453 (1986) (plurality opinion) (internal quotation marks omitted; citation omitted)); *United States* v. *Smith,* 331 U. S. 469, 476 (1947). Under the dissent's approach, the District Court would be placed in the even more difficult position of having to weigh the probative value of "hot" and "cold" evidence on petitioner's guilt or innocence.

This is not to say that our habeas jurisprudence casts a blind eye toward innocence. In a series of cases culminating with *Sawyer* v. *Whitley,* 505 U. S. 333 (1992), decided last Term, we have held that a petitioner otherwise subject to defenses of abusive or successive use of the writ may have his federal constitutional claim considered on the merits if he makes a proper showing of actual innocence. This rule, or fundamental miscarriage of justice exception, is grounded in the "equitable discretion" of habeas courts to see that federal constitutional errors do not result in the incarceration of innocent persons. See *McCleskey, supra,* at 502. But this body of our habeas jurisprudence makes clear that a claim of "actual innocence" is not itself a constitutional claim, but instead a gateway through which a habeas petitioner must pass to have his otherwise barred constitutional claim considered on the merits.

Petitioner in this case is simply not entitled to habeas relief based on the reasoning of this line of cases. For he does not seek excusal of a procedural error so that he may bring an independent constitutional claim challenging his conviction or sentence, but rather argues that he is entitled to habeas relief because newly discovered evidence shows that his conviction is factually incorrect. The fundamental miscarriage of justice exception is available "only where the prisoner *supplements* his constitutional claim with a colorable showing of factual innocence." *Kuhlmann, supra,* at 454 (emphasis added). We have never held that it extends to

freestanding claims of actual innocence. Therefore, the exception is inapplicable here.

Petitioner asserts that this case is different because he has been sentenced to death. But we have "refused to hold that the fact that a death sentence has been imposed requires a different standard of review on federal habeas corpus." *Murray* v. *Giarratano*, 492 U. S. 1, 9 (1989) (plurality opinion). We have, of course, held that the Eighth Amendment requires increased reliability of the process by which capital punishment may be imposed. See, *e. g., McKoy* v. *North Carolina*, 494 U. S. 433 (1990) (unanimity requirement impermissibly limits jurors' consideration of mitigating evidence); *Eddings* v. *Oklahoma*, 455 U. S. 104 (1982) (jury must be allowed to consider all of a capital defendant's mitigating character evidence); *Lockett* v. *Ohio*, 438 U. S. 586, 604 (1978) (plurality opinion) (same). But petitioner's claim does not fit well into the doctrine of these cases, since, as we have pointed out, it is far from clear that a second trial 10 years after the first trial would produce a more reliable result.

Perhaps mindful of this, petitioner urges not that he necessarily receive a new trial, but that his death sentence simply be vacated if a federal habeas court deems that a satisfactory showing of "actual innocence" has been made. Tr. of Oral Arg. 19–20. But such a result is scarcely logical; petitioner's claim is not that some error was made in imposing a capital sentence upon him, but that a fundamental error was made in finding him guilty of the underlying murder in the first place. It would be a rather strange jurisprudence, in these circumstances, which held that under our Constitution he could not be executed, but that he could spend the rest of his life in prison.

Petitioner argues that our decision in *Ford* v. *Wainwright*, 477 U. S. 399 (1986), supports his position. The plurality in *Ford* held that, because the Eighth Amendment prohibits the execution of insane persons, certain procedural protections inhere in the sanity determination. "[I]f the Constitution

renders the fact or timing of his execution contingent upon establishment of a further fact," Justice Marshall wrote, "then that fact must be determined with the high regard for truth that befits a decision affecting the life or death of a human being." *Id.*, at 411. Because the Florida scheme for determining the sanity of persons sentenced to death failed "to achieve even the minimal degree of reliability," *id.*, at 413, the plurality concluded that Ford was entitled to an evidentiary hearing on his sanity before the District Court.

Unlike petitioner here, Ford did not challenge the validity of his conviction. Rather, he challenged the constitutionality of his death sentence in view of his claim of insanity. Because Ford's claim went to a matter of punishment—not guilt—it was properly examined within the purview of the Eighth Amendment. Moreover, unlike the question of guilt or innocence, which becomes more uncertain with time for evidentiary reasons, the issue of sanity is properly considered in proximity to the execution. Finally, unlike the sanity determination under the Florida scheme at issue in *Ford*, the guilt or innocence determination in our system of criminal justice is made "with the high regard for truth that befits a decision affecting the life or death of a human being." *Id.*, at 411.

Petitioner also relies on *Johnson* v. *Mississippi*, 486 U. S. 578 (1988), where we held that the Eighth Amendment requires reexamination of a death sentence based in part on a prior felony conviction which was set aside in the rendering State after the capital sentence was imposed. There, the State insisted that it was too late in the day to raise this point. But we pointed out that the Mississippi Supreme Court had previously considered similar claims by writ of error *coram nobis.* Thus, there was no need to override state law relating to newly discovered evidence in order to consider Johnson's claim on the merits. Here, there is no doubt that petitioner seeks additional process—an evidentiary hearing on his claim of "actual innocence" based on

newly discovered evidence—which is not available under Texas law more than 30 days after imposition or suspension of sentence. Tex. Rule App. Proc. 31(a)(1) (1992).[5]

Alternatively, petitioner invokes the Fourteenth Amendment's guarantee of due process of law in support of his claim that his showing of actual innocence entitles him to a new trial, or at least to a vacation of his death sentence.[6] "[B]ecause the States have considerable expertise in matters of criminal procedure and the criminal process is grounded in centuries of common-law tradition," we have "exercis[ed] substantial deference to legislative judgments in this area." *Medina* v. *California*, 505 U. S. 437, 445–446 (1992). Thus, we have found criminal process lacking only where it " 'offends some principle of justice so rooted in the traditions and

---

[5] The dissent relies on *Beck* v. *Alabama*, 447 U. S. 625 (1980), for the proposition that, "at least in capital cases, the Eighth Amendment requires more than reliability in sentencing. It also mandates a reliable determination of guilt." *Post*, at 434. To the extent *Beck* rests on Eighth Amendment grounds, it simply emphasizes the importance of ensuring the reliability of the guilt determination in capital cases in the first instance. We have difficulty extending this principle to hold that a capital defendant who has been afforded a full and fair trial may challenge his conviction on federal habeas based on after-discovered evidence.

[6] The dissent takes us to task for examining petitioner's Fourteenth Amendment claim in terms of procedural, rather than substantive, due process. Because "[e]xecution of an innocent person is the ultimate 'arbitrary impositio[n],' " *post*, at 437, quoting *Planned Parenthood of Southeastern Pa.* v. *Casey*, 505 U. S. 833, 848 (1992) (internal quotation marks omitted), the dissent concludes that "petitioner may raise a substantive due process challenge to his punishment on the ground that he is actually innocent," *post*, at 437. But the dissent puts the cart before the horse. For its due process analysis rests on the assumption that petitioner is in fact innocent. However, as we have discussed, petitioner does not come before this Court as an innocent man, but rather as one who has been convicted by due process of law of two capital murders. The question before us, then, is not whether due process prohibits the execution of an innocent person, but rather whether it entitles petitioner to judicial review of his "actual innocence" claim. This issue is properly analyzed only in terms of procedural due process.

conscience of our people as to be ranked as fundamental.'"
*Ibid.* (quoting *Patterson* v. *New York,* 432 U. S. 197, 202
(1977)). "Historical practice is probative of whether a pro-
cedural rule can be characterized as fundamental." 505
U. S., at 446.

The Constitution itself, of course, makes no mention of new
trials. New trials in criminal cases were not granted in
England until the end of the 17th century. And even then,
they were available only in misdemeanor cases, though the
writ of error *coram nobis* was available for some errors of
fact in felony cases. Orfield, New Trial in Federal Criminal
Cases, 2 Vill. L. Rev. 293, 304 (1957). The First Congress
provided for new trials for "reasons for which new trials
have usually been granted in courts of law." Act of Sept.
24, 1789, ch. 20, § 17, 1 Stat. 83. This rule was early held to
extend to criminal cases. See *Sparf* v. *United States,* 156
U. S. 51, 175 (1895) (Gray, J., dissenting) (citing cases). One
of the grounds upon which new trials were granted was
newly discovered evidence. See F. Wharton, Criminal
Pleading and Practice §§ 854–874, pp. 584–592 (8th ed. 1880).

The early federal cases adhere to the common-law rule
that a new trial may be granted only during the term of
court in which the final judgment was entered. See, *e. g.,*
*United States* v. *Mayer,* 235 U. S. 55, 67 (1914); *United States*
v. *Simmons,* 27 F. Cas. 1080 (No. 16,289) (CC EDNY 1878).
Otherwise, "the court at a subsequent term has power to
correct inaccuracies in mere matters of form, or clerical er-
rors." 235 U. S., at 67. In 1934, this Court departed from
the common-law rule and adopted a time limit—60 days after
final judgment—for filing new trial motions based on newly
discovered evidence. Rule II(3), Criminal Rules of Practice
and Procedure, 292 U. S. 659, 662. Four years later, we
amended Rule II(3) to allow such motions in capital cases "at
any time" before the execution took place. 304 U. S. 592
(1938) (codified at 18 U. S. C. § 688 (1940)).

There ensued a debate as to whether this Court should abolish the time limit for filing new trial motions based on newly discovered evidence to prevent a miscarriage of justice, or retain a time limit even in capital cases to promote finality. See Orfield, *supra*, at 299–304. In 1946, we set a 2-year time limit for filing new trial motions based on newly discovered evidence and abolished the exception for capital cases. Rule 33, Federal Rules of Criminal Procedure, 327 U. S. ·821, 855–856 ("A motion for a new trial based on the ground of newly discovered evidence may be made only before or within two years after final judgment").[7] We have strictly construed the Rule 33 time limits. Cf. *United States v. Smith*, 331 U. S. 469, 473 (1947). And the Rule's treatment of new trials based on newly discovered evidence has not changed since its adoption.

The American Colonies adopted the English common law on new trials. Riddell, New Trial in Present Practice, 27 Yale L. J. 353, 360 (1917). Thus, where new trials were available, motions for such relief typically had to be filed before the expiration of the term during which the trial was held. H. Underhill, Criminal Evidence 579, n. 1 (1898); J. Bassett, Criminal Pleading and Practice 313 (1885). Over time, many States enacted statutes providing for new trials

---

[7] In response to the second preliminary draft of the Federal Rules of Criminal Procedure, Chief Justice Harlan Stone forwarded a memorandum on behalf of the Court to the Rules Advisory Committee with various comments and suggestions, including the following: "It is suggested that there should be a definite time limit within which motions for new trial based on newly discovered evidence should be made, unless the trial court in its discretion, for good cause shown, allows the motion to be filed. Is it not desirable that at some point of time further consideration of criminal cases by the court should be at an end, after which appeals should be made to Executive clemency alone?" 7 Drafting History of the Federal Rules of Criminal Procedure 3, 7 (M. Wilken & N. Triffin eds. 1991) (responding to proposed Rule 35). As noted above, we eventually rejected the adoption of a flexible time limit for new trial motions, opting instead for a strict 2-year time limit.

in all types of cases. Some States also extended the time period for filing new trial motions beyond the term of court, but most States required that such motions be made within a few days after the verdict was rendered or before the judgment was entered. See American Law Institute Code of Criminal Procedure 1040–1042 (Official Draft 1931) (reviewing contemporary new trials rules).

The practice in the States today, while of limited relevance to our historical inquiry, is divergent. Texas is one of 17 States that requires a new trial motion based on newly discovered evidence to be made within 60 days of judgment.[8] One State adheres to the common-law rule and requires that such a motion be filed during the term in which judgment was rendered.[9] Eighteen jurisdictions have time limits ranging between one and three years, with 10 States and the District of Columbia following the 2-year federal time limit.[10]

---

[8] Ala. Code § 15–17–5 (1982) (30 days); Ariz. Rule Crim. Proc. 24.2(a) (1987) (60 days); Ark. Rule Crim. Proc. 36.22 (1992) (30 days); Fla. Rule Crim. Proc. 3.590 (1992) (10 days); Haw. Rule Penal Proc. 33 (1992) (10 days); Ill. Rev. Stat., ch. 38, ¶ 116–1 (1991) (30 days); Ind. Rule Crim. Proc. 16 (1992) (30 days); Mich. Ct. Rule Crim. Proc. 6.431(A)(1) (1992) (42 days); Minn. Rule Crim. Proc. 26.04(3) (1992) (15 days); Mo. Rule Crim. Proc. 29.11(b) (1992) (15–25 days); Mont. Code Ann. § 46–16–702(2) (1991) (30 days); S. D. Codified Laws § 23A–29–1 (1988) (10 days); Tenn. Rule Crim. Proc. 33(b) (1992) (30 days); Tex. Rule App. Proc. 31(a)(1) (1992) (30 days); Utah Rule Crim. Proc. 24(c) (1992) (10 days); Va. Sup. Ct. Rule 3A:15(b) (1992) (21 days); Wis. Stat. § 809.30(2)(b) (1989–1990) (20 days).

[9] Miss. Cir. Ct. Crim. Rule 5.16 (1992).

[10] Alaska Rule Ct., Crim. Rule 33 (1988) (two years); Conn. Gen. Stat. §§ 52–270, 52–582 (1991) (three years); Del. Ct. Crim. Rule 33 (1987) (two years); D. C. Super. Ct. Crim. Rule 33 (1992) (two years); Kan. Stat. Ann. § 22–3501 (1988) (two years); La. Code Crim. Proc. Ann., Art. 853 (West 1984) (one year); Maine Rule Crim. Proc. 33 (1992) (two years); Md. Rule Crim. Proc. 4–331(c) (1992) (one year); Neb. Rev. Stat. § 29–2103 (1989) (three years); Nev. Rev. Stat. § 176.515(3) (1991) (two years); N. H. Rev. Stat. Ann. § 526:4 (1974) (three years); N. M. Rule Crim. Proc. 5–614(c) (1992) (two years); N. D. Rule Crim. Proc. 33(b) (1992–1993) (two years); Okla. Ct. Rule Crim. Proc., ch. 15, § 953 (1992) (one year); R. I. Super. Ct.

Only 15 States allow a new trial motion based on newly discovered evidence to be filed more than three years after conviction. Of these States, four have waivable time limits of less than 120 days, two have waivable time limits of more than 120 days, and nine States have no time limits.[11]

In light of the historical availability of new trials, our own amendments to Rule 33, and the contemporary practice in the States, we cannot say that Texas' refusal to entertain petitioner's newly discovered evidence eight years after his conviction transgresses a principle of fundamental fairness "rooted in the traditions and conscience of our people." *Patterson* v. *New York*, 432 U. S., at 202 (internal quotation marks and citations omitted). This is not to say, however, that petitioner is left without a forum to raise his actual innocence claim. For under Texas law, petitioner may file a request for executive clemency. See Tex. Const., Art. IV, § 11; Tex. Code Crim. Proc. Ann., Art. 48.01 (Vernon 1979). Clemency [12] is deeply rooted in our Anglo-American tradition

---

Rule Crim. Proc. 33 (1991–1992) (two years); Vt. Rule Crim. Proc. 33 (1983) (two years); Wash. Crim. Rule 7.8(b) (1993) (one year); Wyo. Rule Crim. Proc. 33(c) (1992) (two years).

[11] Cal. Penal Code Ann. § 1181(8) (West 1985) (no time limit); Colo. Rule Crim. Proc. 33 (Supp. 1992) (no time limit); Ga. Code Ann. §§ 5–5–40, 5–5–41 (1982) (30 days, can be extended); Idaho Code § 19–2407 (Supp. 1992) (14 days, can be extended); Iowa Rule Crim. Proc. 23 (1993) (45 days, can be waived); Ky. Rule Crim. Proc. 10.06 (1983) (one year, can be waived); Mass. Rule Crim. Proc. 30 (1979) (no time limit); N. J. Rule Crim. Prac. 3:20–2 (1993) (no time limit); N. Y. Crim. Proc. Law § 440.10(1)(g) (McKinney 1983) (no time limit); N. C. Gen. Stat. § 15A–1415(6) (1988) (no time limit); Ohio Rule Crim. Proc. 33A(6), B (1988) (120 days, can be waived); Ore. Rev. Stat. § 136.535 (1991) (five days, can be waived); Pa. Rule Crim. Proc. 1123(d) (1992) (no time limit); S. C. Rule Crim. Proc. 29(b) (Supp. 1991) (no time limit); W. Va. Rule Crim. Proc. 33 (1992) (no time limit).

[12] The term "clemency" refers not only to full or conditional pardons, but also commutations, remissions of fines, and reprieves. See Kobil, The Quality of Mercy Strained: Wresting the Pardoning Power from the King, 69 Texas L. Rev. 569, 575–578 (1991).

of law, and is the historic remedy for preventing miscarriages of justice where judicial process has been exhausted.[13]

In England, the clemency power was vested in the Crown and can be traced back to the 700's. W. Humbert, The Pardoning Power of the President 9 (1941). Blackstone thought this "one of the great advantages of monarchy in general, above any other form of government; that there is a magistrate, who has it in his power to extend mercy, wherever he thinks it is deserved: holding a court of equity in his own breast, to soften the rigour of the general law, in such criminal cases as merit an exemption from punishment." 4 W. Blackstone, Commentaries *397. Clemency provided the principal avenue of relief for individuals convicted of criminal offenses—most of which were capital—because there was no right of appeal until 1907. 1 L. Radzinowicz, A History of English Criminal Law 122 (1948). It was the only means by which one could challenge his conviction on the ground of innocence. United States Dept. of Justice, 3 Attorney General's Survey of Release Procedures 73 (1939).

Our Constitution adopts the British model and gives to the President the "Power to grant Reprieves and Pardons for Offences against the United States." Art. II, §2, cl. 1. In

---

[13] The dissent relies on the plurality opinion in *Ford* v. *Wainwright*, 477 U. S. 399 (1986), to support the proposition that "[t]he vindication of rights guaranteed by the Constitution has never been made to turn on the unreviewable discretion of an executive official or administrative tribunal." *Post*, at 440. But that case is inapposite insofar as it pertains to our discussion of clemency here. The *Ford* plurality held that Florida's procedures for entertaining post-trial claims of insanity, which vested the sanity determination entirely within the executive branch, were "inadequate to preclude federal redetermination of the constitutional issue [of Ford's sanity]." 477 U. S., at 416. Unlike Ford's claim of insanity, which had never been presented in a judicial proceeding, petitioner's claim of "actual innocence" comes 10 years after he was adjudged guilty beyond a reasonable doubt after a full and fair trial. As the following discussion indicates, it is clear that clemency has provided the historic mechanism for obtaining relief in such circumstances.

*United States* v. *Wilson*, 7 Pet. 150, 160–161 (1833), Chief Justice Marshall expounded on the President's pardon power:

> "As this power had been exercised from time immemorial by the executive of that nation whose language is our language, and to whose judicial institutions ours bear a close resemblance; we adopt their principles respecting the operation and effect of a pardon, and look into their books for the rules prescribing the manner in which it is to be used by the person who would avail himself of it.
>
> "A pardon is an act of grace, proceeding from the power entrusted with the execution of the laws, which exempts the individual, on whom it is bestowed, from the punishment the law inflicts for a crime he has committed. It is the private, though official act of the executive magistrate, delivered to the individual for whose benefit it is intended, and not communicated officially to the court. It is a constituent part of the judicial system, that the judge sees only with judicial eyes, and knows nothing respecting any particular case, of which he is not informed judicially. A private deed, not communicated to him, whatever may be its character, whether a pardon or release, is totally unknown and cannot be acted on. The looseness which would be introduced into judicial proceedings, would prove fatal to the great principles of justice, if the judge might notice and act upon facts not brought regularly into the cause. Such a proceeding, in ordinary cases, would subvert the best established principles, and overturn those rules which have been settled by the wisdom of ages."

See also *Ex parte Garland*, 4 Wall. 333, 380–381 (1867); The Federalist No. 74, pp. 447–449 (C. Rossiter ed. 1961) (A. Hamilton) ("The criminal code of every country partakes so much of necessary severity that without an easy access to excep-

tions in favor of unfortunate guilt, justice would wear a countenance too sanguinary and cruel").

Of course, although the Constitution vests in the President a pardon power, it does not require the States to enact a clemency mechanism. Yet since the British Colonies were founded, clemency has been available in America. C. Jensen, The Pardoning Power in the American States 3–4 (1922). The original States were reluctant to vest the clemency power in the executive. And although this power has gravitated toward the executive over time, several States have split the clemency power between the Governor and an advisory board selected by the legislature. See Survey of Release Procedures, *supra*, at 91–98. Today, all 36 States that authorize capital punishment have constitutional or statutory provisions for clemency.[14]

---

[14] Ala. Const., Amdt. 38, Ala. Code § 15–18–100 (1982); Ariz. Const., Art. V, § 5, Ariz. Rev. Stat. Ann. §§ 31–443, 31–445 (1986 and Supp. 1992); Ark. Const., Art. VI, § 18, Ark. Code Ann. §§ 5–4–607, 16–93–204 (Supp. 1991); Cal. Const., Art. VII, § 1, Cal. Govt. Code Ann. § 12030(a) (West 1992); Colo. Const., Art. IV, § 7, Colo. Rev. Stat. §§ 16–17–101, 16–17–102 (1986); Conn. Const., Art. IV, § 13, Conn. Gen. Stat. § 18–26 (1988); Del. Const., Art. VII, § 1, Del. Code Ann., Tit. 29, § 2103 (1991); Fla. Const., Art. IV, § 8, Fla. Stat. § 940.01 (Supp. 1991); Ga. Const., Art. IV, § 2, ¶ 2, Ga. Code Ann. §§ 42–9–20, 42–9–42 (1991); Idaho Const., Art. IV, § 7, Idaho Code §§ 20–240 (Supp. 1992), 67–804 (1989); Ill. Const., Art. V, § 12, Ill. Rev. Stat., ch. 38, ¶ 1003–3–13 (1991); Ind. Const., Art. V, § 17, Ind. Code §§ 11–9–2–1 to 11–9–2–4, 35–38–6–8 (1988); Ky. Const., § 77; La. Const., Art. IV, § 5(E), La. Rev. Stat. Ann. § 15:572 (West 1992); Md. Const., Art. II, § 20, Md. Ann. Code, Art. 27, § 77 (1992), and Art. 41, § 4–513 (1990); Miss. Const., Art. V, § 124, Miss. Code Ann. § 47–5–115 (1981); Mo. Const., Art. IV, § 7, Mo. Rev. Stat. §§ 217.220 (Vernon Supp. 1992), 552.070 (Vernon 1987); Mont. Const., Art. VI, § 12, Mont. Code Ann. §§ 46–23–301 to 46–23–316 (1991); Neb. Const., Art. IV, § 13, Neb. Rev. Stat. §§ 83–1, 127 to 83–1, 132 (1987); Nev. Const., Art. V, § 13, Nev. Rev. Stat. § 213.080 (1991); N. H. Const., pt. 2, Art. 52, N. H. Rev. Stat. Ann. § 4:23 (1988); N. J. Const., Art. V, § 2, ¶ 1, N. J. Stat. Ann. §§ 2A:167–4, 2A:167–12 (West 1985); N. M. Const., Art. V, § 6, N. M. Stat. Ann. § 31–21–17 (1990); N. C. Const., Art. III, § 5(6), N. C. Gen. Stat. §§ 147–23 to 147–25 (1987); Ohio Const., Art. III, § 11, Ohio Rev. Code Ann. §§ 2967.1 to 2967.12 (1987 and Supp. 1991);

Executive clemency has provided the "fail safe" in our criminal justice system. K. Moore, Pardons: Justice, Mercy, and the Public Interest 131 (1989). It is an unalterable fact that our judicial system, like the human beings who administer it, is fallible. But history is replete with examples of wrongfully convicted persons who have been pardoned in the wake of after-discovered evidence establishing their innocence. In his classic work, Professor Edwin Borchard compiled 65 cases in which it was later determined that individuals had been wrongfully convicted of crimes. Clemency provided the relief mechanism in 47 of these cases; the remaining cases ended in judgments of acquittals after new trials. E. Borchard, Convicting the Innocent (1932). Recent authority confirms that over the past century clemency has been exercised frequently in capital cases in which demonstrations of "actual innocence" have been made. See M. Radelet, H. Bedau, & C. Putnam, In Spite of Innocence 282–356 (1992).[15]

---

Okla. Const., Art. VI, § 10, Okla. Stat., Tit. 21, § 701.11a (Supp. 1990); Ore. Const., Art. V, § 14, Ore. Rev. Stat. §§ 144.640 to 144.670 (1991); Pa. Const., Art. IV, § 9, Pa. Stat. Ann., Tit. 61, § 2130 (Purdon Supp. 1992); S. C. Const., Art. IV, § 14, S. C. Code Ann. §§ 24–21–910 to 24–21–1000 (1977 and Supp. 1991); S. D. Const., Art. IV, § 3, S. D. Codified Laws §§ 23A–27A–20 to 23A–27A–21, 24–14–1 (1988); Tenn. Const., Art. III, § 6, Tenn. Code Ann. §§ 40–27–101 to 40–27–109 (1990); Tex. Const., Art. IV, § 11, Tex. Code Crim. Proc. Ann., Art. 48.01 (Vernon 1979); Utah Const., Art. VII, § 12, Utah Code Ann. § 77–27–5.5 (Supp. 1992); Va. Const., Art. V, § 12, Va. Code Ann. § 53.1–230 (1991); Wash. Const., Art. III, § 9, Wash. Rev. Code § 10.01.120 (1992); Wyo. Const., Art. IV, § 5, Wyo. Stat. § 7–13–801 (1987).

[15] The dissent points to one study concluding that 23 innocent persons have been executed in the United States this century as support for the proposition that clemency requests by persons believed to be innocent are not always granted. See *post*, at 430–431, n. 1 (citing Bedau & Radelet, Miscarriages of Justice in Potentially Capital Cases, 40 Stan. L. Rev. 21 (1987)). Although we do not doubt that clemency—like the criminal justice system itself—is fallible, we note that scholars have taken issue with this study. See Markman & Cassell, Protecting the Innocent: A Response to the Bedau-Radelet Study, 41 Stan. L. Rev. 121 (1988).

In Texas, the Governor has the power, upon the recommendation of a majority of the Board of Pardons and Paroles, to grant clemency. Tex. Const., Art. IV, § 11; Tex. Code Crim. Proc. Ann., Art. 48.01 (Vernon 1979). The board's consideration is triggered upon request of the individual sentenced to death, his or her representative, or the Governor herself. In capital cases, a request may be made for a full pardon, Tex. Admin. Code, Tit. 37, § 143.1 (West Supp. 1992), a commutation of death sentence to life imprisonment or appropriate maximum penalty, § 143.57, or a reprieve of execution, § 143.43. The Governor has the sole authority to grant one reprieve in any capital case not exceeding 30 days. § 143.41(a).

The Texas clemency procedures contain specific guidelines for pardons on the ground of innocence. The board will entertain applications for a recommendation of full pardon because of innocence upon receipt of the following: "(1) a written unanimous recommendation of the current trial officials of the court of conviction; and/or (2) a certified order or judgment of a court having jurisdiction accompanied by certified copy of the findings of fact (if any); and (3) affidavits of witnesses upon which the finding of innocence is based." § 143.2. In this case, petitioner has apparently sought a 30-day reprieve from the Governor, but has yet to apply for a pardon, or even a commutation, on the ground of innocence or otherwise. Tr. of Oral Arg. 7, 34.

As the foregoing discussion illustrates, in state criminal proceedings the trial is the paramount event for determining the guilt or innocence of the defendant. Federal habeas review of state convictions has traditionally been limited to claims of constitutional violations occurring in the course of the underlying state criminal proceedings. Our federal habeas cases have treated claims of "actual innocence," not as an independent constitutional claim, but as a basis upon which a habeas petitioner may have an independent constitutional claim considered on the merits, even though his habeas

petition would otherwise be regarded as successive or abusive. History shows that the traditional remedy for claims of innocence based on new evidence, discovered too late in the day to file a new trial motion, has been executive clemency.

We may assume, for the sake of argument in deciding this case, that in a capital case a truly persuasive demonstration of "actual innocence" made after trial would render the execution of a defendant unconstitutional, and warrant federal habeas relief if there were no state avenue open to process such a claim. But because of the very disruptive effect that entertaining claims of actual innocence would have on the need for finality in capital cases, and the enormous burden that having to retry cases based on often stale evidence would place on the States, the threshold showing for such an assumed right would necessarily be extraordinarily high. The showing made by petitioner in this case falls far short of any such threshold.

Petitioner's newly discovered evidence consists of affidavits. In the new trial context, motions based solely upon affidavits are disfavored because the affiants' statements are obtained without the benefit of cross-examination and an opportunity to make credibility determinations. See Orfield, 2 Vill. L. Rev., at 333. Petitioner's affidavits are particularly suspect in this regard because, with the exception of Raul Herrera, Jr.'s affidavit, they consist of hearsay. Likewise, in reviewing petitioner's new evidence, we are mindful that defendants often abuse new trial motions "as a method of delaying enforcement of just sentences." *United States* v. *Johnson,* 327 U. S. 106, 112 (1946). Although we are not presented with a new trial motion *per se,* we believe the likelihood of abuse is as great—or greater—here.

The affidavits filed in this habeas proceeding were given over eight years after petitioner's trial. No satisfactory explanation has been given as to why the affiants waited until the 11th hour—and, indeed, until after the alleged perpetra-

tor of the murders himself was dead—to make their statements.  Cf. *Taylor* v. *Illinois*, 484 U. S., at 414 ("[I]t is . . . reasonable to presume that there is something suspect about a defense witness who is not identified until after the 11th hour has passed").  Equally troubling, no explanation has been offered as to why petitioner, by hypothesis an innocent man, pleaded guilty to the murder of Rucker.

Moreover, the affidavits themselves contain inconsistencies, and therefore fail to provide a convincing account of what took place on the night Officers Rucker and Carrisalez were killed.  For instance, the affidavit of Raul, Junior, who was nine years old at the time, indicates that there were three people in the speeding car from which the murderer emerged, whereas Hector Villarreal attested that Raul, Senior, told him that there were two people in the car that night.  Of course, Hernandez testified at petitioner's trial that the murderer was the only occupant of the car.  The affidavits also conflict as to the direction in which the vehicle was heading when the murders took place and petitioner's whereabouts on the night of the killings.

Finally, the affidavits must be considered in light of the proof of petitioner's guilt at trial—proof which included two eyewitness identifications, numerous pieces of circumstantial evidence, and a handwritten letter in which petitioner apologized for killing the officers and offered to turn himself in under certain conditions.  See *supra*, at 393–395, and n. 1. That proof, even when considered alongside petitioner's belated affidavits, points strongly to petitioner's guilt.

This is not to say that petitioner's affidavits are without probative value.  Had this sort of testimony been offered at trial, it could have been weighed by the jury, along with the evidence offered by the State and petitioner, in deliberating upon its verdict.  Since the statements in the affidavits contradict the evidence received at trial, the jury would have had to decide important issues of credibility.  But coming 10 years after petitioner's trial, this showing of innocence falls

far short of that which would have to be made in order to trigger the sort of constitutional claim which we have assumed, *arguendo*, to exist.

The judgment of the Court of Appeals is

*Affirmed.*

JUSTICE O'CONNOR, with whom JUSTICE KENNEDY joins, concurring.

I cannot disagree with the fundamental legal principle that executing the innocent is inconsistent with the Constitution. Regardless of the verbal formula employed—"contrary to contemporary standards of decency," *post*, at 430 (dissenting opinion) (relying on *Ford* v. *Wainwright*, 477 U. S. 399, 406 (1986)), "shocking to the conscience," *post*, at 430 (relying on *Rochin* v. *California*, 342 U. S. 165, 172 (1952)), or offensive to a " ' "principle of justice so rooted in the traditions and conscience of our people as to be ranked as fundamental," ' " *ante*, at 407–408 (opinion of the Court) (quoting *Medina* v. *California*, 505 U. S. 437, 445–446 (1992), in turn quoting *Patterson* v. *New York*, 432 U. S. 197, 202 (1977))—the execution of a legally and factually innocent person would be a constitutionally intolerable event. Dispositive to this case, however, is an equally fundamental fact: Petitioner is not innocent, in any sense of the word.

As the Court explains, *ante*, at 398–400, petitioner is not innocent in the eyes of the law because, in our system of justice, "the trial is the paramount event for determining the guilt or innocence of the defendant," *ante*, at 416. Accord, *post*, at 441 (dissenting opinion). In petitioner's case, that paramount event occurred 10 years ago. He was tried before a jury of his peers, with the full panoply of protections that our Constitution affords criminal defendants. At the conclusion of that trial, the jury found petitioner guilty beyond a reasonable doubt. Petitioner therefore does not appear before us as an innocent man on the verge of execution. He is instead a legally guilty one who, refusing to accept

the jury's verdict, demands a hearing in which to have his culpability determined once again. *Ante,* at 399–400.

Consequently, the issue before us is not whether a State can execute the innocent. It is, as the Court notes, whether a fairly convicted and therefore legally guilty person is constitutionally entitled to yet another judicial proceeding in which to adjudicate his guilt anew, 10 years after conviction, notwithstanding his failure to demonstrate that constitutional error infected his trial. *Ante,* at 407, n. 6; see *ante,* at 399–400. In most circumstances, that question would answer itself in the negative. Our society has a high degree of confidence in its criminal trials, in no small part because the Constitution offers unparalleled protections against convicting the innocent. *Ante,* at 398–399. The question similarly would be answered in the negative today, except for the disturbing nature of the claim before us. Petitioner contends not only that the Constitution's protections "sometimes fail," *post,* at 430 (dissenting opinion), but that their failure in his case will result in his execution—even though he is factually innocent and has evidence to prove it.

Exercising restraint, the Court and JUSTICE WHITE assume for the sake of argument that, if a prisoner were to make an exceptionally strong showing of actual innocence, the execution could not go forward. JUSTICE BLACKMUN, in contrast, would expressly so hold; he would also announce the precise burden of proof. Compare *ante,* at 417 (opinion of the Court) (We assume, "for the sake of argument in deciding this case, that in a capital case a truly persuasive demonstration of 'actual innocence' made after trial would render the execution of a defendant unconstitutional and warrant federal habeas relief if there were no state avenue open to process such a claim"), and *ante,* at 429 (WHITE, J., concurring in judgment) (assuming that a persuasive showing of actual innocence would render a conviction unconstitutional but explaining that, even under such an assumption, "petitioner would at the very least be required to show that based

on proffered newly discovered evidence and the entire record before the jury that convicted him, 'no rational trier of fact could [find] proof of guilt beyond reasonable doubt.' *Jackson* v. *Virginia*, 443 U. S. 307, 314 (1979)"), with *post*, at 442 (dissenting opinion) ("I would hold that, to obtain relief on a claim of actual innocence, the petitioner must show that he probably is innocent"). Resolving the issue is neither necessary nor advisable in this case. The question is a sensitive and, to say the least, troubling one. It implicates not just the life of a single individual, but also the State's powerful and legitimate interest in punishing the guilty, and the nature of state-federal relations. Indeed, as the Court persuasively demonstrates, *ante*, at 398–417, throughout our history the federal courts have assumed that they should not and could not intervene to prevent an execution so long as the prisoner had been convicted after a constitutionally adequate trial. The prisoner's sole remedy was a pardon or clemency.

Nonetheless, the proper disposition of this case is neither difficult nor troubling. No matter what the Court might say about claims of actual innocence today, petitioner could not obtain relief. The record overwhelmingly demonstrates that petitioner deliberately shot and killed Officers Rucker and Carrisalez the night of September 29, 1981; petitioner's new evidence is bereft of credibility. Indeed, despite its stinging criticism of the Court's decision, not even the dissent expresses a belief that petitioner might possibly be actually innocent. Nor could it: The record makes it abundantly clear that petitioner is not somehow the future victim of "simple murder," *post*, at 446 (dissenting opinion), but instead himself the established perpetrator of two brutal and tragic ones.

Petitioner's first victim was Texas Department of Public Safety Officer David Rucker, whose body was found lying beside his patrol car. The body's condition indicated that a struggle had taken place and that Rucker had been shot in the head at rather close range. Petitioner's Social Security

card was found nearby. Shortly after Rucker's body was discovered, petitioner's second victim, Los Fresnos Police Officer Enrique Carrisalez, stopped a car speeding away from the murder scene. When Carrisalez approached, the driver shot him. Carrisalez lived long enough to identify petitioner as his assailant. Enrique Hernandez, a civilian who was riding with Carrisalez, also identified petitioner as the culprit. Moreover, at the time of the stop, Carrisalez radioed a description of the car and its license plates to the police station. The license plates corresponded to a car that petitioner was known to drive. Although the car belonged to petitioner's girlfriend, she did not have a set of keys; petitioner did. He even had a set in his pocket at the time of his arrest.

When the police arrested petitioner, they found more than car keys; they also found evidence of the struggle between petitioner and Officer Rucker. Human blood was spattered across the hood, the left front fender, the grill, and the interior of petitioner's car. There were spots of blood on petitioner's jeans; blood had even managed to splash into his wallet. The blood was, like Rucker's and unlike petitioner's, type A. Blood samples also matched Rucker's enzyme profile. Only 6% of the Nation's population shares both Rucker's blood type and his enzyme profile.

But the most compelling piece of evidence was entirely of petitioner's own making. When the police arrested petitioner, he had in his possession a signed letter in which he acknowledged responsibility for the murders; at the end of the letter, petitioner offered to turn himself in:

> "'I am terribly sorry for those [to whom] I have brought grief . . . . What happened to Rucker was for a certain reason. . . . [H]e violated some of [the] laws [of my drug business] and suffered the penalty, like the one you have for me when the time comes. . . . The other officer [Carrisalez] . . . had not[hing] to do [with] this. He was out to do what he had to do, protect, but that's life. . . . [I]f

this is read word for word over the media, I will turn myself in . . . .'" *Ante*, at 395, n. 1.

There can be no doubt about the letter's meaning. When the police attempted to interrogate petitioner about the killings, he told them "'it was all in the letter'" and suggested that, if "they wanted to know what happened," they should read it. *Herrera* v. *State*, 682 S. W. 2d 313, 317 (Tex. Crim. App. 1984), cert. denied, 471 U. S. 1131 (1985).

Now, 10 years after being convicted on that seemingly dispositive evidence, petitioner has collected four affidavits that he claims prove his innocence. The affidavits allege that petitioner's brother, who died six years before the affidavits were executed, was the killer—and that petitioner was not. Affidavits like these are not uncommon, especially in capital cases. They are an unfortunate although understandable occurrence. It seems that, when a prisoner's life is at stake, he often can find someone new to vouch for him. Experience has shown, however, that such affidavits are to be treated with a fair degree of skepticism.

These affidavits are no exception. They are suspect, produced as they were at the 11th hour with no reasonable explanation for the nearly decade-long delay. See *ante*, at 417–418. Worse, they conveniently blame a dead man— someone who will neither contest the allegations nor suffer punishment as a result of them. Moreover, they contradict each other on numerous points, including the number of people in the murderer's car and the direction it was heading when Officer Carrisalez stopped it. *Ante*, at 418. They do not even agree on when Officer Rucker was killed. According to one, Rucker was killed when he and the murderer met at a highway rest stop. Brief for Petitioner 30. In contrast, another asserts that there was an initial meeting, but that Rucker was not killed until afterward when he "pulled [the murderer's car] over" on the highway. *Id.*, at 27. And the affidavits are inconsistent with petitioner's own admission of guilt. The affidavits blame petitioner's deceased

brother for *both* the Rucker and Carrisalez homicides—even though petitioner pleaded guilty to murdering Rucker and contested only the Carrisalez slaying.

Most critical of all, however, the affidavits pale when compared to the proof at trial. While some bits of circumstantial evidence can be explained, petitioner offers no plausible excuse for the most damaging piece of evidence, the signed letter in which petitioner confessed and offered to turn himself in. One could hardly ask for more unimpeachable—or more unimpeached—evidence of guilt.

The conclusion seems inescapable: Petitioner is guilty. The dissent does not contend otherwise. Instead, it urges us to defer to the District Court's determination that petitioner's evidence was not "so insubstantial that it could be dismissed without any hearing at all." *Post*, at 444. I do not read the District Court's decision as making any such determination. Nowhere in its opinion did the District Court question the accuracy of the jury's verdict. Nor did it pass on the sufficiency of the affidavits. The District Court did not even suggest that it wished to hold an evidentiary hearing on petitioner's actual innocence claims. Indeed, the District Court apparently believed that a hearing would be futile because the court could offer no relief in any event. As the court explained, claims of "newly discovered evidence bearing directly upon guilt or innocence" are not cognizable on habeas corpus "unless the petition implicates a constitutional violation." App. 38.

As the dissent admits, *post*, at 444, the District Court had an altogether different reason for entering a stay of execution. It believed, from a "sense of fairness and due process," App. 38, that petitioner should have the chance to present his affidavits to the *state courts*. *Id.*, at 38–39; *ante*, at 397. But the District Court did not hold that the state courts should hold a hearing either; it instead ordered the habeas petition dismissed and the stay lifted once the state court action was filed, without further condition. App. 39. As

the Court of Appeals recognized, that rationale was insufficient to support the stay order. Texas courts do not recognize new evidence claims on collateral review. *Id.*, at 67–68. Nor would they entertain petitioner's claim as a motion for a new trial; under Texas law, such motions must be made within 30 days of trial. See *ante,* at 400, 410; App. 68. Because petitioner could not have obtained relief—or even a hearing—through the state courts, it was error for the District Court to enter a stay permitting him to try.

Of course, the Texas courts would not be free to turn petitioner away if the Constitution required otherwise. But the District Court did not hold that the Constitution required them to entertain petitioner's claim. On these facts, that would be an extraordinary holding. Petitioner did not raise his claim shortly after Texas' 30-day limit expired; he raised it eight years too late. Consequently, the District Court would have had to conclude not that Texas' 30-day limit for new evidence claims was too short to comport with due process, but that applying an 8-year limit to petitioner would be. As the Court demonstrates today, see *ante,* at 408–411, there is little in fairness or history to support such a conclusion.

But even if the District Court did hold that further federal proceedings were warranted, surely it abused its discretion. The affidavits do not reveal a likelihood of actual innocence. See *ante,* at 393–395, 417–419; *supra,* at 423–427. In-person repetition of the affiants' accounts at an evidentiary hearing could not alter that; the accounts are, on their face and when compared to the proof at trial, unconvincing. As a result, further proceedings were improper even under the rather lax standard the dissent urges, for " 'it plainly appear[ed] from the face of the petition and [the] exhibits annexed to it that the petitioner [wa]s not entitled to relief.' " *Post,* at 445 (quoting 28 U. S. C. § 2254 Rule 4).

The abuse of discretion is particularly egregious given the procedural posture. The District Court actually entered an order staying the execution. Such stays on "second or suc-

cessive federal habeas petition[s] should be granted only when there are 'substantial grounds upon which relief might be granted,'" *Delo* v. *Stokes*, 495 U. S. 320, 321 (1990) (quoting *Barefoot* v. *Estelle*, 463 U. S. 880, 895 (1983)), and only when the equities favor the petitioner, see *Gomez* v. *United States Dist. Court for Northern Dist. of Cal.*, 503 U. S. 653, 654 (1992) (Whether a claim is framed "as a habeas petition or as a [42 U. S. C.] § 1983 action, [what is sought is] an equitable remedy. . . . A court may consider the last-minute nature of an application to stay execution in deciding whether to grant equitable relief"). Petitioner's claim satisfied neither condition. The grounds petitioner offered in his habeas petition were anything but substantial. And the equities favored the State. Petitioner delayed presenting his new evidence until eight years after conviction—without offering a semblance of a reasonable excuse for the inordinate delay. At some point in time, the State's interest in finality must outweigh the prisoner's interest in yet another round of litigation. In this case, that point was well short of eight years.

Unless federal proceedings and relief—if they are to be had at all—are reserved for "extraordinarily high" and "truly persuasive demonstration[s] of 'actual innocence'" that cannot be presented to state authorities, *ante*, at 417, the federal courts will be deluged with frivolous claims of actual innocence. Justice Jackson explained the dangers of such circumstances some 40 years ago:

> "It must prejudice the occasional meritorious application to be buried in a flood of worthless ones. He who must search a haystack for a needle is likely to end up with the attitude that the needle is not worth the search." *Brown* v. *Allen*, 344 U. S. 443, 537 (1953) (concurring in result).

If the federal courts are to entertain claims of actual innocence, their attention, efforts, and energy must be reserved

for the truly extraordinary case; they ought not be forced to sort through the insubstantial and the incredible as well.

\* \* \*

Ultimately, two things about this case are clear. First is what the Court does *not* hold. Nowhere does the Court state that the Constitution permits the execution of an actually innocent person. Instead, the Court assumes for the sake of argument that a truly persuasive demonstration of actual innocence would render any such execution unconstitutional and that federal habeas relief would be warranted if no state avenue were open to process the claim. Second is what petitioner has not demonstrated. Petitioner has failed to make a persuasive showing of actual innocence. Not one judge—no state court judge, not the District Court Judge, none of the three judges of the Court of Appeals, and none of the Justices of this Court—has expressed doubt about petitioner's guilt. Accordingly, the Court has no reason to pass on, and appropriately reserves, the question whether federal courts may entertain convincing claims of actual innocence. That difficult question remains open. If the Constitution's guarantees of fair procedure and the safeguards of clemency and pardon fulfill their historical mission, it may never require resolution at all.

JUSTICE SCALIA, with whom JUSTICE THOMAS joins, concurring.

We granted certiorari on the question whether it violates due process or constitutes cruel and unusual punishment for a State to execute a person who, having been convicted of murder after a full and fair trial, later alleges that newly discovered evidence shows him to be "actually innocent." I would have preferred to decide that question, particularly since, as the Court's discussion shows, it is perfectly clear what the answer is: There is no basis in text, tradition, or even in contemporary practice (if that were enough) for find-

ing in the Constitution a right to demand judicial consideration of newly discovered evidence of innocence brought forward after conviction. In saying that such a right exists, the dissenters apply nothing but their personal opinions to invalidate the rules of more than two-thirds of the States, and a Federal Rule of Criminal Procedure for which this Court itself is responsible. If the system that has been in place for 200 years (and remains widely approved) "shock[s]" the dissenters' consciences, *post*, at 430, perhaps they should doubt the calibration of their consciences, or, better still, the usefulness of "conscience shocking" as a legal test.

I nonetheless join the entirety of the Court's opinion, including the final portion, *ante*, at 417–419—because there is no legal error in deciding a case by assuming, *arguendo*, that an asserted constitutional right exists, and because I can understand, or at least am accustomed to, the reluctance of the present Court to admit publicly that Our Perfect Constitution* lets stand any injustice, much less the execution of an innocent man who has received, though to no avail, all the process that our society has traditionally deemed adequate. With any luck, we shall avoid ever having to face this embarrassing question again, since it is improbable that evidence of innocence as convincing as today's opinion requires would fail to produce an executive pardon.

My concern is that in making life easier for ourselves we not appear to make it harder for the lower federal courts, imposing upon them the burden of regularly analyzing newly-discovered-evidence-of-innocence claims in capital cases (in which event such federal claims, it can confidently be predicted, will become routine and even repetitive). A number of Courts of Appeals have hitherto held, largely in

---

*My reference is to an article by Professor Monaghan, which discusses the unhappy truth that not every problem was meant to be solved by the United States Constitution, nor can be. See Monaghan, Our Perfect Constitution, 56 N. Y. U. L. Rev. 353 (1981).

reliance on our unelaborated statement in *Townsend* v. *Sain*, 372 U. S. 293, 317 (1963), that newly discovered evidence relevant only to a state prisoner's guilt or innocence is not a basis for federal habeas corpus relief. See, *e. g., Boyd* v. *Puckett*, 905 F. 2d 895, 896–897 (CA5), cert. denied, 498 U. S. 988 (1990); *Stockton* v. *Virginia*, 852 F. 2d 740, 749 (CA4 1988), cert. denied, 489 U. S. 1071 (1989); *Swindle* v. *Davis*, 846 F. 2d 706, 707 (CA11 1988) *(per curiam); Byrd* v. *Armontrout*, 880 F. 2d 1, 8 (CA8 1989), cert. denied, 494 U. S. 1019 (1990); *Burks* v. *Egeler*, 512 F. 2d 221, 230 (CA6), cert. denied, 423 U. S. 937 (1975). I do not understand it to be the import of today's decision that those holdings are to be replaced with a strange regime that assumes permanently, though only *"arguendo,"* that a constitutional right exists, and expends substantial judicial resources on that assumption. The Court's extensive and scholarly discussion of the question presented in the present case does nothing but support our statement in *Townsend* and strengthen the validity of the holdings based upon it.

JUSTICE WHITE, concurring in the judgment.

In voting to affirm, I assume that a persuasive showing of "actual innocence" made after trial, even though made after the expiration of the time provided by law for the presentation of newly discovered evidence, would render unconstitutional the execution of petitioner in this case. To be entitled to relief, however, petitioner would at the very least be required to show that based on proffered newly discovered evidence and the entire record before the jury that convicted him, "no rational trier of fact could [find] proof of guilt beyond a reasonable doubt." *Jackson* v. *Virginia*, 443 U. S. 307, 324 (1979). For the reasons stated in the Court's opinion, petitioner's showing falls far short of satisfying even that standard, and I therefore concur in the judgment.

JUSTICE BLACKMUN, with whom JUSTICE STEVENS and JUSTICE SOUTER join with respect to Parts I–IV, dissenting.

Nothing could be more contrary to contemporary standards of decency, see *Ford* v. *Wainwright,* 477 U. S. 399, 406 (1986), or more shocking to the conscience, see *Rochin* v. *California,* 342 U. S. 165, 172 (1952), than to execute a person who is actually innocent.

I therefore must disagree with the long and general discussion that precedes the Court's disposition of this case. See *ante,* at 398–417. That discussion, of course, is dictum because the Court assumes, "for the sake of argument in deciding this case, that in a capital case a truly persuasive demonstration of 'actual innocence' made after trial would render the execution of a defendant unconstitutional." *Ante,* at 417. Without articulating the standard it is applying, however, the Court then decides that this petitioner has not made a sufficiently persuasive case. Because I believe that in the first instance the District Court should decide whether petitioner is entitled to a hearing and whether he is entitled to relief on the merits of his claim, I would reverse the order of the Court of Appeals and remand this case for further proceedings in the District Court.

## I

The Court's enumeration, *ante,* at 398–399, of the constitutional rights of criminal defendants surely is entirely beside the point. These protections sometimes fail.[1] We really

---

[1] One impressive study has concluded that 23 innocent people have been executed in the United States in this century, including one as recently as 1984. Bedau & Radelet, Miscarriages of Justice in Potentially Capital Cases, 40 Stan. L. Rev. 21, 36, 173–179 (1987); M. Radelet, H. Bedau, & C. Putnam, In Spite of Innocence 282–356 (1992). The majority cites this study to show that clemency has been exercised frequently in capital cases when showings of actual innocence have been made. See *ante,* at 415. But the study also shows that requests for clemency by persons the authors believe were innocent have been refused. See, *e. g.,* Bedau & Radelet, 40 Stan. L. Rev., at 91 (discussing James Adams who was executed in

are being asked to decide whether the Constitution forbids the execution of a person who has been validly convicted and sentenced but who, nonetheless, can prove his innocence with newly discovered evidence. Despite the State of Texas' astonishing protestation to the contrary, see Tr. of Oral Arg. 37, I do not see how the answer can be anything but "yes."

## A

The Eighth Amendment prohibits "cruel and unusual punishments." This proscription is not static but rather reflects evolving standards of decency. *Ford* v. *Wainwright,* 477 U. S., at 406; *Gregg* v. *Georgia,* 428 U. S. 153, 171 (1976) (opinion of Stewart, Powell, and STEVENS, JJ.); *Trop* v. *Dulles,* 356 U. S. 86, 101 (1958) (plurality opinion); *Weems* v. *United States,* 217 U. S. 349, 373 (1910). I think it is crystal clear that the execution of an innocent person is "at odds with contemporary standards of fairness and decency." *Spaziano* v. *Florida,* 468 U. S. 447, 465 (1984). Indeed, it is at odds with any standard of decency that I can imagine.

This Court has ruled that punishment is excessive and unconstitutional if it is "nothing more than the purposeless and needless imposition of pain and suffering," or if it is "grossly out of proportion to the severity of the crime." *Coker* v. *Georgia,* 433 U. S. 584, 592 (1977) (plurality opinion); *Gregg* v. *Georgia,* 428 U. S., at 173 (opinion of Stewart, Powell, and STEVENS, JJ.). It has held that death is an excessive punishment for rape, *Coker* v. *Georgia,* 433 U. S., at 592, and for mere participation in a robbery during which a killing takes place, *Enmund* v. *Florida,* 458 U. S. 782, 797 (1982). If it is violative of the Eighth Amendment to execute someone who is guilty of those crimes, then it plainly is violative of the Eighth Amendment to execute a person who is actually innocent. Executing an innocent person epitomizes "the

Florida on May 10, 1984); Radelet, Bedau, & Putnam, In Spite of Innocence, at 5–10 (same).

purposeless and needless imposition of pain and suffering." *Coker* v. *Georgia*, 433 U. S., at 592.[2]

The protection of the Eighth Amendment does not end once a defendant has been validly convicted and sentenced. In *Johnson* v. *Mississippi*, 486 U. S. 578 (1988), the petitioner had been convicted of murder and sentenced to death on the basis of three aggravating circumstances. One of those circumstances was that he previously had been convicted of a violent felony in the State of New York. After Johnson had been sentenced to death, the New York Court of Appeals reversed his prior conviction. Although there was no question that the prior conviction was valid at the time of Johnson's sentencing, this Court held that the Eighth Amendment required review of the sentence because "the jury was allowed to consider evidence that has been revealed to be materially inaccurate." *Id.*, at 590.[3] In *Ford* v. *Wainwright*, the petitioner had been convicted of murder and sen-

---

[2] It also may violate the Eighth Amendment to imprison someone who is actually innocent. See *Robinson* v. *California*, 370 U. S. 660, 667 (1962) ("Even one day in prison would be a cruel and unusual punishment for the 'crime' of having a common cold"). On the other hand, this Court has noted that "'death is a different kind of punishment from any other which may be imposed in this country. . . . From the point of view of the defendant, it is different in both its severity and its finality.'" *Beck* v. *Alabama*, 447 U. S. 625, 637 (1980), quoting *Gardner* v. *Florida*, 430 U. S. 349, 357 (1977) (opinion of STEVENS, J.). We are not asked to decide in this case whether petitioner's continued imprisonment would violate the Constitution if he actually is innocent, see Brief for Petitioner 39, n. 52; Tr. of Oral Arg. 3–5, and I do not address that question.

[3] The majority attempts to distinguish *Johnson* on the ground that Mississippi previously had considered claims like Johnson's by writ of error *coram nobis*. *Ante*, at 406–407. We considered Mississippi's past practice in entertaining such claims, however, to determine not whether an Eighth Amendment violation had occurred but whether there was an independent and adequate state ground preventing us from reaching the merits of Johnson's claim. See 486 U. S., at 587–589. Respondent does not argue that there is any independent and adequate state ground that would prevent us from reaching the merits in this case.

tenced to death. There was no suggestion that he was incompetent at the time of his offense, at trial, or at sentencing, but subsequently he exhibited changes in behavior that raised doubts about his sanity. This Court held that Florida was required under the Eighth Amendment to provide an additional hearing to determine whether Ford was mentally competent, and that he could not be executed if he were incompetent. 477 U. S., at 410 (plurality opinion); *id.,* at 422–423 (Powell, J., concurring in part and concurring in judgment). Both *Johnson* and *Ford* recognize that capital defendants may be entitled to further proceedings because of an intervening development even though they have been validly convicted and sentenced to death.

Respondent and the United States as *amicus curiae* argue that the Eighth Amendment does not apply to petitioner because he is challenging his guilt, not his punishment. Brief for Respondent 21–23; Brief for United States as *Amicus Curiae* 9–12. The majority attempts to distinguish *Ford* on that basis. *Ante,* at 405–406.[4] Such reasoning, however, not only contradicts our decision in *Beck* v. *Alabama,* 447 U. S. 625 (1980), but also fundamentally misconceives the nature of petitioner's argument. Whether petitioner is viewed as challenging simply his death sentence or also his continued detention, he still is challenging the State's right to punish him. Respondent and the United States would impose a clear line between guilt and punishment, reasoning that every claim that concerns guilt necessarily does not involve punishment. Such a division is far too facile. What respondent and the United States fail to recognize is that the

---

[4] The Court also suggests that *Ford* is distinguishable because "unlike the question of guilt or innocence . . . the issue of sanity is properly considered in proximity to the execution." *Ante,* at 406. Like insanity, however, newly discovered evidence of innocence may not appear until long after the conviction and sentence. In *Johnson,* the New York Court of Appeals decision that required reconsideration of Johnson's sentence came five years after he had been sentenced to death. 486 U. S., at 580–582.

legitimacy of punishment is inextricably intertwined with guilt.

*Beck* makes this clear. In *Beck*, the petitioner was convicted of the capital crime of robbery-intentional killing. Under Alabama law, however, the trial court was prohibited from giving the jury the option of convicting him of the lesser included offense of felony murder. We held that precluding the instruction injected an impermissible element of uncertainty into the guilt phase of the trial.

> "To insure that the death penalty is indeed imposed on the basis of 'reason rather than caprice or emotion,' we have invalidated procedural rules that tended to diminish the reliability of the sentencing determination. The same reasoning must apply to rules that diminish the reliability of the guilt determination. Thus, if the unavailability of a lesser included offense instruction enhances the risk of an unwarranted conviction, [the State] is constitutionally prohibited from withdrawing that option in a capital case." *Id.*, at 638 (footnote omitted).

The decision in *Beck* establishes that, at least in capital cases, the Eighth Amendment requires more than reliability in sentencing. It also mandates a reliable determination of guilt. See also *Spaziano* v. *Florida*, 468 U. S., at 456.

The Court also suggests that allowing petitioner to raise his claim of innocence would not serve society's interest in the reliable imposition of the death penalty because it might require a new trial that would be less accurate than the first. *Ante*, at 403–404. This suggestion misses the point entirely. The question is not whether a second trial would be more reliable than the first but whether, in light of new evidence, the result of the first trial is sufficiently reliable for the State to carry out a death sentence. Furthermore, it is far from clear that a State will seek to retry the rare prisoner who prevails on a claim of actual innocence. As explained in Part III, *infra*, I believe a prisoner must show not just that there

was probably a reasonable doubt about his guilt but that he is probably actually innocent. I find it difficult to believe that any State would choose to retry a person who meets this standard.

I believe it contrary to any standard of decency to execute someone who is actually innocent. Because the Eighth Amendment applies to questions of guilt or innocence, *Beck* v. *Alabama*, 447 U. S., at 638, and to persons upon whom a valid sentence of death has been imposed, *Johnson* v. *Mississippi*, 486 U. S., at 590, I also believe that petitioner may raise an Eighth Amendment challenge to his punishment on the ground that he is actually innocent.

### B

Execution of the innocent is equally offensive to the Due Process Clause of the Fourteenth Amendment. The majority's discussion misinterprets petitioner's Fourteenth Amendment claim as raising a procedural, rather than a substantive, due process challenge.[5]

> "The Due Process Clause of the Fifth Amendment provides that 'No person shall . . . be deprived of life, liberty, or property, without due process of law . . . .' This Court has held that the Due Process Clause protects individuals against two types of government action. So-called 'substantive due process' prevents the

---

[5] The majority's explanation for its failure to address petitioner's substantive due process argument is fatuous. The majority would deny petitioner the opportunity to bring a substantive due process claim of actual innocence because a jury has previously found that he is not actually innocent. See *ante*, at 407, n. 6. To borrow a phrase, this "puts the cart before the horse." *Ibid.*

Even under the procedural due process framework of *Medina* v. *California*, 505 U. S. 437 (1992), the majority's analysis is incomplete, for it fails to consider "whether the rule transgresses any recognized principle of 'fundamental fairness' in operation." *Id.*, at 448, quoting *Dowling* v. *United States*, 493 U. S. 342, 352 (1990).

government from engaging in conduct that 'shocks the conscience,' *Rochin* v. *California,* 342 U. S. 165, 172 (1952), or interferes with rights 'implicit in the concept of ordered liberty,' *Palko* v. *Connecticut,* 302 U. S. 319, 325–326 (1937). When government action depriving a person of life, liberty, or property survives substantive due process scrutiny, it must still be implemented in a fair manner. *Mathews* v. *Eldridge,* 424 U. S. 319, 335 (1976). This requirement has traditionally been referred to as 'procedural' due process." *United States* v. *Salerno,* 481 U. S. 739, 746 (1987).

Petitioner cites not *Mathews* v. *Eldridge,* 424 U. S. 319 (1976), or *Medina* v. *California,* 505 U. S. 437 (1992), in support of his due process claim, but *Rochin.* Brief for Petitioner 32–33.

Just last Term, we had occasion to explain the role of substantive due process in our constitutional scheme. Quoting the second Justice Harlan, we said:

"'[T]he full scope of the liberty guaranteed by the Due Process Clause cannot be found in or limited by the precise terms of the specific guarantees elsewhere provided in the Constitution. This "liberty" is not a series of isolated points . . . . It is a rational continuum which, broadly speaking, includes a freedom from all substantial arbitrary impositions and purposeless restraints . . . .'" *Planned Parenthood of Southeastern Pa.* v. *Casey,* 505 U. S. 833, 848 (1992), quoting *Poe* v. *Ullman,* 367 U. S. 497, 543 (1961) (opinion dissenting from dismissal on jurisdictional grounds).

Petitioner's claim falls within our due process precedents. In *Rochin,* deputy sheriffs investigating narcotics sales broke into Rochin's room and observed him put two capsules in his mouth. The deputies attempted to remove the capsules from his mouth and, having failed, took Rochin to a hospital and had his stomach pumped. The capsules were

found to contain morphine. The Court held that the deputies' conduct "shock[ed] the conscience" and violated due process. 342 U. S., at 172. "Illegally breaking into the privacy of the petitioner, the struggle to open his mouth and remove what was there, the forcible extraction of his stomach's contents—this course of proceeding by agents of government to obtain evidence is bound to offend even hardened sensibilities. They are methods too close to the rack and the screw to permit of constitutional differentiation." *Ibid.* The lethal injection that petitioner faces as an allegedly innocent person is certainly closer to the rack and the screw than the stomach pump condemned in *Rochin.* Execution of an innocent person is the ultimate "'arbitrary impositio[n].'" *Planned Parenthood,* 505 U. S., at 848. It is an imposition from which one never recovers and for which one can never be compensated. Thus, I also believe that petitioner may raise a substantive due process challenge to his punishment on the ground that he is actually innocent.

## C

Given my conclusion that it violates the Eighth and Fourteenth Amendments to execute a person who is actually innocent, I find no bar in *Townsend* v. *Sain,* 372 U. S. 293 (1963), to consideration of an actual-innocence claim. Newly discovered evidence of petitioner's innocence does bear on the constitutionality of his execution. Of course, it could be argued this is in some tension with *Townsend*'s statement, *id.,* at 317, that "the existence merely of newly discovered evidence relevant to the guilt of a state prisoner is not a ground for relief on federal habeas corpus." That statement, however, is no more than distant dictum here, for we never had been asked to consider whether the execution of an innocent person violates the Constitution.

## II

The majority's discussion of petitioner's constitutional claims is even more perverse when viewed in the light of this

Court's recent habeas jurisprudence. Beginning with a trio of decisions in 1986, this Court shifted the focus of federal habeas review of successive, abusive, or defaulted claims away from the preservation of constitutional rights to a fact-based inquiry into the habeas petitioner's guilt or innocence. See *Kuhlmann* v. *Wilson*, 477 U. S. 436, 454 (plurality opinion); *Murray* v. *Carrier*, 477 U. S. 478, 496; *Smith* v. *Murray*, 477 U. S. 527, 537; see also *McCleskey* v. *Zant*, 499 U. S. 467, 493–494 (1991). The Court sought to strike a balance between the State's interest in the finality of its criminal judgments and the prisoner's interest in access to a forum to test the basic justice of his sentence. *Kuhlmann* v. *Wilson*, 477 U. S., at 452. In striking this balance, the Court adopted the view of Judge Friendly that there should be an exception to the concept of finality when a prisoner can make a colorable claim of actual innocence. Friendly, Is Innocence Irrelevant? Collateral Attack on Criminal Judgments, 38 U. Chi. L. Rev. 142, 160 (1970).

Justice Powell, writing for the plurality in *Wilson*, explained the reason for focusing on innocence:

> "The prisoner may have a vital interest in having a second chance to test the fundamental justice of his incarceration. Even where, as here, the many judges who have reviewed the prisoner's claims in several proceedings provided by the State and on his first petition for federal habeas corpus have determined that his trial was free from constitutional error, a prisoner retains a powerful and legitimate interest in obtaining his release from custody if he is innocent of the charge for which he was incarcerated. That interest does not extend, however, to prisoners whose guilt is conceded or plain." 477 U. S., at 452.

In other words, even a prisoner who appears to have had a *constitutionally perfect* trial "retains a powerful and legitimate interest in obtaining his release from custody if he is

innocent of the charge for which he was incarcerated." It is obvious that this reasoning extends beyond the context of successive, abusive, or defaulted claims to substantive claims of actual innocence. Indeed, Judge Friendly recognized that substantive claims of actual innocence should be cognizable on federal habeas. 38 U. Chi. L. Rev., at 159–160, and n. 87.

Having adopted an "actual-innocence" requirement for review of abusive, successive, or defaulted claims, however, the majority would now take the position that "a claim of 'actual innocence' is not itself a constitutional claim, but instead a gateway through which a habeas petitioner must pass to have his otherwise barred constitutional claim considered on the merits." *Ante*, at 404. In other words, having held that a prisoner who is incarcerated in violation of the Constitution must show he is actually innocent to obtain relief, the majority would now hold that a prisoner who is actually innocent must show a constitutional violation to obtain relief. The only principle that would appear to reconcile these two positions is the principle that habeas relief should be denied whenever possible.

### III

The Eighth and Fourteenth Amendments, of course, are binding on the States, and one would normally expect the States to adopt procedures to consider claims of actual innocence based on newly discovered evidence. See *Ford* v. *Wainwright*, 477 U. S., at 411–417 (plurality opinion) (minimum requirements for state-court proceeding to determine competency to be executed). The majority's disposition of this case, however, leaves the States uncertain of their constitutional obligations.

### A

Whatever procedures a State might adopt to hear actual-innocence claims, one thing is certain: The possibility of executive clemency is *not* sufficient to satisfy the requirements of the Eighth and Fourteenth Amendments. The majority

correctly points out: "'A pardon is an act of grace.'" *Ante*, at 413. The vindication of rights guaranteed by the Constitution has never been made to turn on the unreviewable discretion of an executive official or administrative tribunal. Indeed, in *Ford* v. *Wainwright*, we explicitly rejected the argument that executive clemency was adequate to vindicate the Eighth Amendment right not to be executed if one is insane. 477 U. S., at 416. The possibility of executive clemency "exists in every case in which a defendant challenges his sentence under the Eighth Amendment. Recognition of such a bare possibility would make judicial review under the Eighth Amendment meaningless." *Solem* v. *Helm*, 463 U. S. 277, 303 (1983).

"The government of the United States has been emphatically termed a government of laws, and not of men. It will certainly cease to deserve this high appellation, if the laws furnish no remedy for the violation of a vested legal right." *Marbury* v. *Madison*, 1 Cranch 137, 163 (1803). If the exercise of a legal right turns on "an act of grace," then we no longer live under a government of laws. "The very purpose of a Bill of Rights was to withdraw certain subjects from the vicissitudes of political controversy, to place them beyond the reach of majorities and officials and to establish them as legal principles to be applied by the courts." *West Virginia Bd. of Ed.* v. *Barnette*, 319 U. S. 624, 638 (1943). It is understandable, therefore, that the majority does not say that the vindication of petitioner's constitutional rights may be left to executive clemency.

### B

Like other constitutional claims, Eighth and Fourteenth Amendment claims of actual innocence advanced on behalf of a state prisoner can and should be heard in state court. If a State provides a judicial procedure for raising such claims, the prisoner may be required to exhaust that procedure before taking his claim of actual innocence to federal court. See 28 U. S. C. §§ 2254(b) and (c). Furthermore, state-court

determinations of factual issues relating to the claim would be entitled to a presumption of correctness in any subsequent federal habeas proceeding. See § 2254(d).

Texas provides no judicial procedure for hearing petitioner's claim of actual innocence and his habeas petition was properly filed in district court under § 2254. The district court is entitled to dismiss the petition summarily only if "it plainly appears from the face of the petition and any exhibits annexed to it that the petitioner is not entitled to relief." § 2254 Rule 4. If, as is the case here, the petition raises factual questions and the State has failed to provide a full and fair hearing, the district court is required to hold an evidentiary hearing. *Townsend* v. *Sain*, 372 U. S., at 313.

Because the present federal petition is petitioner's second, he must either show cause for, and prejudice from, failing to raise the claim in his first petition or show that he falls within the "actual-innocence" exception to the cause and prejudice requirement. *McCleskey* v. *Zant*, 499 U. S., at 494–495. If petitioner can show that he is entitled to relief on the merits of his actual-innocence claim, however, he certainly can show that he falls within the "actual-innocence" exception to the cause and prejudice requirement and *McCleskey* would not bar relief.

## C

The question that remains is what showing should be required to obtain relief on the merits of an Eighth or Fourteenth Amendment claim of actual innocence. I agree with the majority that "in state criminal proceedings the trial is the paramount event for determining the guilt or innocence of the defendant." *Ante*, at 416. I also think that "a truly persuasive demonstration of 'actual innocence' made after trial would render the execution of a defendant unconstitutional." *Ante*, at 417. The question is what "a truly persuasive demonstration" entails, a question the majority's disposition of this case leaves open.

In articulating the "actual-innocence" exception in our habeas jurisprudence, this Court has adopted a standard requiring the petitioner to show a " 'fair probability that, in light of all the evidence . . . , the trier of the facts would have entertained a reasonable doubt of his guilt.' " *Kuhlmann* v. *Wilson*, 477 U. S., at 455, n. 17. In other words, the habeas petitioner must show that there probably would be a reasonable doubt. See also *Murray* v. *Carrier*, 477 U. S., at 496 (exception applies when a constitutional violation has "probably resulted" in a mistaken conviction); *McCleskey* v. *Zant*, 499 U. S., at 494 (exception applies when a constitutional violation "probably has caused" a mistaken conviction).[6]

I think the standard for relief on the merits of an actual-innocence claim must be higher than the threshold standard for merely reaching that claim or any other claim that has been procedurally defaulted or is successive or abusive. I would hold that, to obtain relief on a claim of actual innocence, the petitioner must show that he probably is innocent. This standard is supported by several considerations. First, new evidence of innocence may be discovered long after the defendant's conviction. Given the passage of time, it may

---

[6] Last Term in *Sawyer* v. *Whitley*, 505 U. S. 333 (1992), this Court adopted a different standard for determining whether a federal habeas petitioner bringing a successive, abusive, or defaulted claim has shown "actual innocence" of the death penalty. Under *Sawyer*, the petitioner must "show by clear and convincing evidence that, but for a constitutional error, no reasonable juror would have found the petitioner eligible for the death penalty under applicable state law." *Id.*, at 336. That standard would be inappropriate here. First, it requires a showing of constitutional error in the trial process, which, for reasons already explained, is inappropriate when petitioner makes a substantive claim of actual innocence. Second, it draws its "no reasonable juror" standard from the standard for sufficiency of the evidence set forth in *Jackson* v. *Virginia*, 443 U. S. 307 (1979). As I explain below, however, sufficiency of the evidence review differs in important ways from the question of actual innocence. Third, the Court developed this standard for prisoners who are concededly guilty of capital crimes. Here, petitioner claims that he is actually innocent of the capital crime.

be difficult for the State to retry a defendant who obtains relief from his conviction or sentence on an actual-innocence claim. The actual-innocence proceeding thus may constitute the final word on whether the defendant may be punished. In light of this fact, an otherwise constitutionally valid conviction or sentence should not be set aside lightly. Second, conviction after a constitutionally adequate trial strips the defendant of the presumption of innocence. The government bears the burden of proving the defendant's guilt beyond a reasonable doubt, *Jackson* v. *Virginia,* 443 U. S. 307, 315 (1979); *In re Winship,* 397 U. S. 358, 364 (1970), but once the government has done so, the burden of proving innocence must shift to the convicted defendant. The actual-innocence inquiry is therefore distinguishable from review for sufficiency of the evidence, where the question is not whether the defendant is innocent but whether the government has met its constitutional burden of proving the defendant's guilt beyond a reasonable doubt. When a defendant seeks to challenge the determination of guilt after he has been validly convicted and sentenced, it is fair to place on him the burden of proving his innocence, not just raising doubt about his guilt.

In considering whether a prisoner is entitled to relief on an actual-innocence claim, a court should take all the evidence into account, giving due regard to its reliability. See *Sawyer* v. *Whitley,* 505 U. S., at 339, n. 5 (1992); *Kuhlmann* v. *Wilson,* 477 U. S., at 455, n. 17; Friendly, 38 U. Chi. L. Rev., at 160. Because placing the burden on the prisoner to prove innocence creates a presumption that the conviction is valid, it is not necessary or appropriate to make further presumptions about the reliability of newly discovered evidence generally. Rather, the court charged with deciding such a claim should make a case-by-case determination about the reliability of the newly discovered evidence under the circumstances. The court then should weigh the evidence in favor of the prisoner against the evidence of his guilt.

Obviously, the stronger the evidence of the prisoner's guilt, the more persuasive the newly discovered evidence of innocence must be. A prisoner raising an actual-innocence claim in a federal habeas petition is not entitled to discovery as a matter of right. *Harris* v. *Nelson*, 394 U. S. 286, 295 (1969); 28 U. S. C. § 2254 Rule 6. The district court retains discretion to order discovery, however, when it would help the court make a reliable determination with respect to the prisoner's claim. *Harris* v. *Nelson*, 394 U. S., at 299–300; see Advisory Committee Note on Rule 6, 28 U. S. C., pp. 421–422.

It should be clear that the standard I would adopt would not convert the federal courts into "'forums in which to relitigate state trials.'" *Ante,* at 401, quoting *Barefoot* v. *Estelle,* 463 U. S. 880, 887 (1983). It would not "require the habeas court to hear testimony from the witnesses who testified at trial," *ante,* at 402, though, if the petition warrants a hearing, it may require the habeas court to hear the testimony of "those who made the statements in the affidavits which petitioner has presented." *Ibid.* I believe that if a prisoner can show that he is probably actually innocent, in light of all the evidence, then he has made "a truly persuasive demonstration," *ante,* at 417, and his execution would violate the Constitution. I would so hold.

## IV

In this case, the District Court determined that petitioner's newly discovered evidence warranted further consideration. Because the District Court doubted its own authority to consider the new evidence, it thought that petitioner's claim of actual innocence should be brought in state court, see App. 38–39, but it clearly did not think that petitioner's evidence was so insubstantial that it could be dismissed without any hearing at all.[7] I would reverse the order of the

---

[7] JUSTICE O'CONNOR reads too much into the fact that the District Court failed to pass on the sufficiency of the affidavits, did not suggest that it wished to hold an evidentiary hearing, and did not retain jurisdiction after

Court of Appeals and remand the case to the District Court to consider whether petitioner has shown, in light of all the evidence, that he is probably actually innocent.

I think it is unwise for this Court to step into the shoes of a district court and rule on this petition in the first instance. If this Court wishes to act as a district court, however, it must also be bound by the rules that govern consideration of habeas petitions in district court. A district court may summarily dismiss a habeas petition only if "it plainly appears from the face of the petition and any exhibits annexed to it that the petitioner is not entitled to relief." 28 U. S. C. § 2254 Rule 4. In one of the affidavits, Hector Villarreal, a licensed attorney and former state court judge, swears under penalty of perjury that his client Raul Herrera, Sr., confessed that he, and not petitioner, committed the murders. No matter what the majority may think of the inconsistencies in the affidavits or the strength of the evidence presented at trial, this affidavit alone is sufficient to raise factual questions concerning petitioner's innocence that cannot be resolved simply by examining the affidavits and the petition.

I do not understand why the majority so severely faults petitioner for relying only on affidavits. *Ante*, at 417. It is common to rely on affidavits at the preliminary-consideration stage of a habeas proceeding. The opportunity for cross-examination and credibility determinations comes at the hearing, assuming that the petitioner is entitled to one. It makes no sense for this Court to impugn the reliability of petitioner's evidence on the ground that its credibility has not been tested when the reason its credibility has not been tested is that petitioner's habeas proceeding has been truncated by the Court of Appeals and now by this Court. In its haste to deny petitioner relief, the majority seems to confuse the question whether the petition may be dismissed

---

the state-court action was filed. *Ante*, at 424. The explanation for each of these actions, as JUSTICE O'CONNOR notes, is that the District Court believed that it could offer no relief in any event. *Ibid.*

summarily with the question whether petitioner is entitled to relief on the merits of his claim.

## V

I have voiced disappointment over this Court's obvious eagerness to do away with any restriction on the States' power to execute whomever and however they please. See *Coleman* v. *Thompson*, 501 U. S. 722, 758–759 (1991) (dissenting opinion). See also *Coleman* v. *Thompson*, 504 U. S. 188, 189 (1992) (dissent from denial of stay of execution). I have also expressed doubts about whether, in the absence of such restrictions, capital punishment remains constitutional at all. *Sawyer* v. *Whitley*, 505 U. S., at 343–345 (opinion concurring in judgment). Of one thing, however, I am certain. Just as an execution without adequate safeguards is unacceptable, so too is an execution when the condemned prisoner can prove that he is innocent. The execution of a person who can show that he is innocent comes perilously close to simple murder.