[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] Memorandum of Decision
The petitioner, Leonard Talton alleges in his petition for a Writ of Habeas Corpus initially filed on April 8, 1999 and amended on May 3, 1999, September 7, 2001, and for a final time on March 15, 2002, that his 1998 convictions for one count of murder in violation of CGS § 53a-54a, conspiracy to commit murder in violation of CGS § 53a-54a and 53a-48, two counts of criminal possession of a pistol/revolver in violation of CGS §§ 53a-217 (a) and (c) respectively, one count of commission of a felony with a firearm in violation of CGS § 53a-202k, and one count of carrying a pistol without a permit in violation of CGS § 29-28
were obtained in violation of the Sixth andFourteenth Amendments to the United States Constitution and Article I, Section 8 of the Constitution of the state of Connecticut. He claims to have been denied effective representation by his trial defense counsel. This matter came on for trial before this Court on November 18, 2002, January 13, 2003 and again on February 24, 2003 at which time testimony was received from the petitioner, his trial defense counsel, Attorney Lawrence Hopkins, Patricia Snowden (the petitioner's mother), Leonard Talton, Sr. (the petitioner's father), Richard Snowden (the petitioner's brother and co-defendant), Arthur Moore, Attorney Thomas Farver (an expert witness on Criminal Trial Defense matters), and Detectives Leroy Dease and Edwin Rodriquez (of the New Haven Police Department). Numerous pieces of documentary evidence were also received, including, inter alia, the transcript of the petitioner's trial on the underlying matter. For the reasons set forth more fully below, the petitioner has failed in meeting his burden of proof and the petition shall be denied.
As regards the claim of ineffective assistance of trial defense counsel, the petitioner alleges that his trial defense counsel failed to: adequately advise the petitioner concerning his options regarding defenses; adequately investigate the legal issues; investigate potential defenses; investigate elements of the prosecution proof; effectively cross examine a witness, Tacuma Greer; object to a violation of the trial CT Page 2821 Court's sequestration order by the victim's sister; adequately investigate elements of the defense case; adequately investigate witnesses who might be available to support potential defenses. In addition, the petitioner alleges that the trial defense counsel failed to object an incident in which the trial judge was reportedly observed entering the jury deliberation room during the jury deliberations.
Findings of Fact
The Court has reviewed all of the testimony and evidence and makes the following findings of fact (further facts will be related as necessary to resolve specific claims).
1. The petitioner was the defendant in a case in the Judicial District of New Haven at New Haven, under Docket Number CR97-0446889 entitledState v. Talton. The petitioner was charged with one count of murder in violation of CGS § 53a-54a, conspiracy to commit murder in violation of CGS §§ 53a-54a and 53a-48, two counts of criminal possession of a pistol/revolver in violation of CGS §§ 53a-217 (a) and (c) respectively, one count of commission of a felony with a firearm in violation of CGS § 53a-202k, and one count of carrying a pistol without a permit in violation of CGS § 29-28.
2. The petitioner initially decided to represent himself with the assistance of standby counsel. The petitioner's trial defense counsel, Attorney Lawrence Hopkins was appointed standby counsel by the Court on September 15, 1998.
3. The petitioner changed his mind and on October 6, 1998 asked the Court, Fracasse, J., to appoint Attorney Hopkins as the trial defense counsel. The motion was granted.
4. Trial in the case commenced on November 9, 1998.
5. The petitioner was found guilty by the jury on all counts on November 13, 1998.
6. As for the facts of the underlying offenses, the jury could have reasonably found that "on March 22, 1997, at approximately 8:30 p.m., a shooting occurred at the Quinnipiac Terrace Housing Complex (housing complex) in New Haven. As a result, the victim, Tyrone Belton, died after receiving a single gunshot wound to the chest. A friend of the victim, Tacumah Grear, witnessed the shooting and the events that had led to the shooting. The shooting arose from a dispute involving a motorbike that had occurred on the day before the shooting. On the morning of March 21, CT Page 2822 1997, the victim and Grear were taking turns riding the victim's motorbike at the housing complex. While the victim was passing the motorbike to Grear, Richard Snowden, the [petitioner's] brother, approached them and asked if he could also ride the motorbike. The victim responded in the negative. Nevertheless, Snowden took the motorbike and rode off on it. When Snowden returned with the motorbike, the victim punched Snowden in the face, knocking him unconscious. Snowden subsequently reported the incident to his friend, Sean Bethea. Later that day, Bethea confronted the victim about the incident and the two engaged in a fistfight. After the fight, the parties discussed the matter, and the victim was under the impression that they had resolved the dispute involving the motorbike. The victim's impression, however, would prove to be wrong. On the following evening, the victim and Grear were standing in a parking lot located in the housing complex. While waiting there, two men approached them; one was wearing a camouflage mask, and the other was wearing a hood pulled tightly over his head. Despite their disguises, Grear recognized the two men as the [petitioner] and Snowden because he had known both of them before the night in question. One of the assailants told Grear to leave so that he could "handle [his] business." Grear understood that to mean that the assailants wanted to shoot the victim. Grear stepped between the assailants and the victim, and told them that he would not leave. A struggle ensued during which the hooded man, the [petitioner], brandished a gun and prepared to fire it. The victim saw the gun and, in response, pushed Grear to the ground to prevent him from being shot. After falling to the ground, Grear saw the hooded man point the gun at the victim and fire it. The victim fell to the ground, and the assailants fled the scene." State v. Talton,63 Conn. App. 851 at 853-54 (1998).
7. The Appellate Court denied the petitioner's direct appeal in a decision entitled: State v. Talton, 63 Conn. App. 851 (1998), cert. den.258 Conn. 907.
Discussion of Law
It is important at the outset to understand a critical difference between the legal status of a person who has been accused of a crime as opposed to one who has been convicted of a crime. While the person who has been accused of a crime is entitled to a presumption of his or her innocence, the petitioner in a habeas corpus petition, having already been convicted, is not. "It is undoubtedly true that `[a] person when first charged with a crime is entitled to a presumption of innocence, and may insist that his guilt be established beyond a reasonable doubt. In reWinship, 397 U.S. 385, 90 S.Ct. 1068, 25 L.Ed.2d 368 (1970).' Herrera v.Collins, 506 U.S. 390, 113 S.Ct. 853, 859, 122 L.Ed.2d 203 (1993). . . CT Page 2823 The presumption of innocence, however, does not outlast the judgment of conviction at trial . . . Thus, in the eyes of the law, [the] petitioner does not come before the Court as one who is `innocent,' but on the contrary as one who has been convicted by due process of law."Summerville v. Warden, 229 Conn. 397 at 422-23 (1994).
In considering the alleged deficient performance of the petitioner's trial defense counsel, the claim of ineffective assistance of counsel must satisfy both prongs of the test set forth by the United States Supreme Court in Strickland v. Washington, 466 U.S. 688, 104 S.Ct. 2052,80 L.Ed.2d 674, reh. denied 467 U.S. 1267, 104 S.Ct. 3562,82 L.Ed.2d (1984) before the Court can grant relief. Specifically, the petitioner must first show "that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the `counsel' guaranteed the defendant by theSixth Amendment." Strickland, infra at 687. If, and only if, the petitioner manages to get over the first hurdle, then the petitioner must clear the second obstacle by proving "that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable. Unless a defendant makes both showings, it cannot be said that the conviction . . . resulted from a breakdown in the adversary process that renders the result unreliable." Strickland, infra at 687. In short, the petitioner must show both deficiency and prejudice. A failure to prove both, even though a counsel's trial performance may have been substandard, will result in denial of the petition.
It is a critical fact to understand that trial in this Court of a habeas petition is not an opportunity for a new counsel to attempt to re-litigate a case in a different manner. It is indisputable fact that many times if one had foreknowledge of certain events; different courses might well have been taken. Likewise, a habeas court knowing the outcome of the trial "may not indulge in hindsight to reconstruct the circumstances surrounding the challenged conduct, but must evaluate the acts or omissions from trial counsel's perspective at the time of trial."Beasley v. Commissioner of Corrections, 47 Conn. App. 253 at 264 (1979), cert. den. 243 Conn. 967 (1998). "A fair assessment of an attorney's performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances to counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time. Because of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." Henry v. Commissioner of Correction, 60 Conn. App. 313
at 317 (2000). CT Page 2824
In other words it is not the business of the habeas court to serve as a "Monday morning quarterback" and to critically pick apart every tactical decision made by trial defense counsel. By the time the case reaches this Court as a petition for habeas corpus, it is self-evident that the strategy that was actually adopted by trial defense counsel was unsuccessful. Had it been successful, then the petitioner would have been acquitted and never have filed the petition in the first place. So the question then is whether the trial defense counsel made a reasonable tactical decision in light of all of the circumstances.[1] If so, even though there may have been another tack to use, the assistance of trial defense counsel will be found to be effective.
Furthermore, it is not necessary to consider whether a trial counsel's performance was deficient if the habeas Court is satisfied that there was no prejudice to the defendant by the actions of the trial counsel in representing the petitioner. "A reviewing court can find against a petitioner on either ground, whichever is easier. Strickland v.Washington, supra, 697; see Nardini v. Manson, 207 Conn. 118, 124,540 A.2d 69 (1988) ('[a] court deciding an ineffective assistance of counsel claim need not address the question of counsel's performance, if it is easier to dispose of the claim on the ground of insufficient prejudice')" Valeriano v. Bronson, 209 Conn. 75 at 86 (1988).
In the instant case, it is clear that the petitioner's trial defense counsel did a satisfactory job of representing the petitioner. The thrust of the petitioner's complaint is that his trial defense counsel did not present the alibi defense that the petitioner thought would have been successful. It is clear that the decision as to which defense to present is a tactical decision that rests primarily within the expertise of the attorney who is representing the petitioner. Here, Attorney Hopkins was faced with the choice of presenting the alibi defense and totally denying that his client was involved in the shooting whatsoever, or deciding to forego the formal alibi defense and attempt to show the inconsistencies in the state's case and argue that the state failed in his burden to show the petitioner's guilt. He chose the latter path. In addition, Attorney Hopkins raised the possibility that the fatal shot was accidentally fired, thereby giving the jury an opportunity to believe that the petitioner was at the scene, but still acquit him of the murder. In order to resolve this case, it is necessary to evaluate the potential alibi defense.
A failed alibi defense can be catastrophic for the defense. With an alibi defense, the defendant in a criminal trial more or less concedes that a crime has been committed but says that it was committed by someone CT Page 2825 else. As always, the burden to disprove the alibi lies with the prosecution, but the defendant must raise the issue. Attorney Hopkins astutely offered the observation that a good alibi defense will, more often than not, work to prevent the trial in the first place. Unfortunately, while the petitioner may have had the semblance of an alibi defense, it could hardly be called a good one. In fact, had the alibi defense been presented to the jury, it is most likely that the jury would have found it to be incredible. This would have clearly undermined the strategy that the trial defense counsel was attempting to put forth. In retrospect, it is hard to see how the petitioner would have been any worse off for having presented the alibi defense since he was found guilty of all of the charges anyway. Attorney Hopkins, of course, did not have the benefit of knowing the outcome of the trial when he made the tactical decision to forego a formal alibi defense.
In essence, the petitioner asserts that on March 22, 1997, the night that Tyrone Belton was killed, he was at his mother's home a few blocks away from the crime scene. He stated that he arrived at her home about 4:00 PM and remained there until approximately 9:00 PM. The murder took place somewhere around 8:30 PM.[2] At the habeas trial, Patricia Snowden testified that the petitioner was at her home during these hours. Likewise, Richard Snowden told the same story and confirmed that both he and the petitioner were in his mother's house for the entire time between 4:00 PM and 9:00 PM. If this testimony were true, then it would constitute a viable alibi defense and would exonerate the petitioner. However, there were some prior statements given to the police that seriously undermine this testimony.
The initial police investigation showed that the petitioner and his brother, Richard Snowden, were prime suspects in this shooting. Consequently, the police sought interviews with both men and both provided statements to the police. Their stories were similar except in one key respect. Both men reported having been at Patricia Snowden's home between 4:00 PM and 9:00 PM with the exception of a trip to the liquor store that took place between the hours of 7:00 PM and 8:00 PM. The petitioner said that they went to one liquor store, while his brother gave the name of a different liquor store. The police officers also spoke with Mrs. Snowden who confirmed that the two men did leave her house although she said that they returned shortly after 9:00 PM. In addition, Richard Snowden is reported by the police to have admitted being present at the time of the shooting. The petitioner, Richard Snowden and Patricia Snowden all denied in their testimony at the habeas trial that they had ever made these statements to the police.
In determining whether or not to pursue the alibi defense, Attorney CT Page 2826 Hopkins was confronted with the fact that his client's alibi was defective. First, all of the witnesses who could corroborate the alibi were family members of the petitioner. Second, one of the alibi witnesses, Richard Snowden, was himself on trial for this murder.[3]
Third, all of the alibi witnesses had made prior inconsistent statements that would have severely affected the credibility of the potential trial testimony establishing an alibi. Had this alibi defense been presented to the jury, there was a strong likelihood that they would conclude the witnesses were lying.
In lieu of a formal alibi defense, Attorney Hopkins did use the defense case to poke holes in the state's case. In fact, he called the jury's attention to the paucity of proof regarding who did the shooting.[4] In this way, he planted the question of the petitioner's whereabouts on the night of the murder in the minds of the jury in such a way that he did not have to use the risky formal alibi evidence. Given the recantation of the state's eyewitness to the shooting, Tacuma Greer, this was a wise tactical move.
The issue of recantation of testimony is another area that the petitioner alleges ineffectiveness of his trial defense counsel. While Mr. Greer did testify at the trial that it was not the petitioner who did the shooting, he had made a previously sworn statement to the police that clearly and expressly inculpated the petitioner. This statement was admitted into evidence and excepted as substantive evidence under the authority of State v. Whelan, 200 Conn. 743, cert.den. 479 U.S. 994
(1986). At the habeas trial, the petitioner presented the testimony of one Arthur Moore who testified that he saw a "light-skinned black man" do the shooting and that since the petitioner was much darker, it was not him. Mr. Moore had also given a statement to the police that clearly and expressly identified the petitioner as the person who shot the victim. At the habeas trial, Mr. Moore testified that he had been paid $110.00 by the police, forced to make this tape-recorded statement and that it was false. Attorney Hopkins did not call Arthur Moore at the petitioner's trial. His reasoning was that even if Arthur Moore testified that he could not identify the shooter, the state would have been able to get his detailed statement given to the police in as substantive evidence underState v. Whelan, 200 Conn. 743, cert.den. 479 U.S. 994 (1986). He decided that since there was already one such statement, Tacuma Grear's, admitted into evidence, another one would be detrimental to his client's case. Consequently, Attorney Hopkins made another wise tactical decision to not call Arthur Moore as a witness.
There was an allegation that the trial judge entered the jury deliberation room during their deliberations. There is some inconsistency CT Page 2827 in the proof of this allegation, however. The sole witness who reports that it happened is the petitioner's father. He was a bit vague as to when this event occurred. There is no supporting testimony from the trial judge or any of the jurors that the judge had gone into deliberation room. There was no testimony of a sheriff being placed at the door of the jury room as is normally the case in jury deliberations. There is no proof as to whether there were any jurors inside at the time, even assuming the judge had entered the room. Attorney Hopkins was not aware of this event having occurred and testified that he would have brought it to the judge's attention if he had been told that it had happened. Consequently, this Court is not convinced that the trial judge entered the room at all. That being the case, this allegation is dismissed as a basis upon which to grant the habeas petition.
All other allegations are similarly without basis. As far as any violation of a sequestration order, the petitioner has failed to convince the Court that there was a violation, much less demonstrate that any prejudice resulted therefrom. Attorney Hopkins did a good job in defending the petitioner and was an effective trial counsel. While the petitioner is understandably upset at the outcome of the trial, his rights under the United States and State of Connecticut Constitutions were not abridged in any way.
Accordingly, the Petition for a Writ of Habeas Corpus is denied.
S.T. Fuger, Jr., Judge