NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 12a1289n.06

**No. 11-1966**

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

FILED

*Dec 14, 2012*

DEBORAH S. HUNT, Clerk

| | | |
|---|---|---|
| NICHOLAS ASHMON, | ) | |
| | ) | |
| Petitioner-Appellant, | ) | |
| | ) | |
| v. | ) | ON APPEAL FROM THE UNITED |
| | ) | STATES DISTRICT COURT FOR THE |
| BARRY D. DAVIS, | ) | EASTERN DISTRICT OF MICHIGAN |
| | ) | |
| Respondent-Appellee. | ) | |

Before: GUY, SUTTON and COOK, Circuit Judges.

SUTTON, Circuit Judge. A Michigan jury convicted Nicholas Ashmon of several crimes, including assault with intent to murder, arising from a drive-by shooting. The state courts affirmed his convictions, and a federal district court denied his habeas petition. We affirm.

On a spring day in 2005, Titus Petty and two of his buddies drove through a Detroit neighborhood in Petty's black sedan. They met some friends at a gas station, after which three other cars showed up. The cars eventually all left together, following each other through the streets. Petty noticed something odd after he exited the gas station. A Chevy Caprice lurking nearby began following him.

Some of the drivers eventually began spinning circles in the road, swerving onto the grass and otherwise driving recklessly. Petty joined in. So did the Caprice. One of these maneuvers

propelled Petty's car toward the Caprice, and the two vehicles passed—hood to hood— within four feet of each other. As they passed, someone in the Caprice fired several shots at Petty's sedan and hit the rear passenger, Justin Neely. As more shots were fired at his car, Petty drove Neely to the hospital and contacted the police.

The driver of the Caprice was Nicholas Ashmon. His friend Martale Stephen rode in the front passenger seat. In the back sat an acquaintance identified only as "Tommy." R.1-8 at 2. Michigan prosecutors charged Ashmon with various assault and weapons crimes, and a jury convicted him. He is serving a sentence of 15 to 42 years. After exhausting his state-court appeals, Ashmon petitioned for a writ of habeas corpus in federal court. *See* 28 U.S.C. § 2254. The district court denied the writ and refused to issue a certificate of appealability. We granted a certificate on Ashmon's ineffective-assistance-of-counsel claim under the Sixth (and Fourteenth) Amendment.

Two sets of rules govern this appeal. The first is that a claim of ineffective assistance requires the claimant to show unconstitutionally deficient performance (something outside "the wide range of reasonable professional assistance," *Strickland v. Washington*, 466 U.S. 668, 689 (1984)) and prejudice ("a reasonable probability" that "the result of the proceeding would have been different" but for counsel's errors, *id.* at 694). The second is that the Antiterrorism and Effective Death Penalty Act limits a federal court's authority to second guess a state court's ruling on the merits, permitting us to override the decision only if it amounts to "an unreasonable application of" relevant Supreme Court precedents. *See* 28 U.S.C. § 2254(d)(1). "A state court's determination that

a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision." *Harrington v. Richter*, 131 S. Ct. 770, 786 (2011).

Ashmon complains that his trial counsel should have interviewed Martale Stephen and called him to testify, and that his appellate counsel should have raised the issue on direct appeal. On state collateral review, a Michigan court, applying *Strickland*, rejected Ashmon's claims on the merits. Among other grounds, it concluded that Stephen's failure to testify did not prejudice Ashmon.

Resolution of the prejudice question suffices to resolve this case, and it comes to this: What is the likelihood that Martale Stephen's testimony would have changed the trial's outcome? Not good, a state court reasonably could conclude, given the state court evidentiary record. In an affidavit filed in the state collateral review proceeding, Stephen says that (1) Tommy, not Ashmon, shot the gun, (2) Stephen would have testified to that effect at trial had he been asked and (3) he does not know Tommy's last name or where anyone might find him. Ashmon offered his own affidavit, saying he told his trial counsel how to contact Stephen. Conspicuously missing from the record is an affidavit from Ashmon's trial counsel, and Ashmon gives no explanation why he did not get one.

Against this evidence the state collateral review court had to weigh considerable evidence that Ashmon fired the shots. All three victims testified, and all three said they saw the shooter. Titus Petty testified that, as his car passed Ashmon's, their faces came within three-and-a-half to four feet of each other. He saw Ashmon extend his arm out the window—gun in hand—and start firing. "What I exactly saw," he said, "was the Defendant stuck his arm out the window about four feet

away from me, aiming for me." R.5-9 at 111. Justin Neely was riding in the back of Petty's car. He looked out the driver's-side rear window and saw Ashmon firing out the front window of his car. Ramir Jackson was the front passenger in Petty's car. He too said he saw Ashmon fire from the driver's window. Petty and Jackson also picked Ashmon out of a photo lineup as the shooter. None of the three youths had ever seen Ashmon before the day of the shooting.

Fair-minded jurists could conclude there is no reasonable probability that Martale Stephen's testimony would have changed the outcome of Ashmon's trial. The eyewitness testimony of all three victims devastated any theory that the shots came from the back seat of Ashmon's car. Those witnesses had no apparent motive to lie. Stephen's testimony, by contrast, would have been tainted with a motive to absolve his friend by conveniently pinning the crime on the essentially anonymous back-seat passenger, somehow known only as "Tommy" (even though he was in the back seat of their car) and whose whereabouts somehow remain unknown. The timing of Stephen's revelations also gives pause. Ashmon was convicted in 2005, but Stephen waited nearly three years to sign his affidavit. If Stephen knew that his friend had been wrongly convicted and was languishing in prison, why wait? Ashmon has produced nothing suggesting that Stephen ever told the police about Tommy or took any other steps to place blame where it allegedly belonged. This delay undermines the credibility of Stephen's testimony. *See, e.g.*, *Herrera v. Collins*, 506 U.S. 390, 417–18 (1993).

On this record, the state court reasonably concluded that Ashmon did not demonstrate prejudice. Absent that showing, a claim of ineffective assistance of trial counsel must fail. *Strickland*, 466 U.S. at 696. And Ashmon's appellate counsel could not have been ineffective for

No. 11-1966
*Ashmon v. Davis*

failing to raise a problem that did not result in prejudice.  *See Smith v. Robbins*, 528 U.S. 259, 285

(2000).

      For these reasons, we affirm.