# SUPREME COURT OF THE UNITED STATES

_____

No. 24–5753 (24A349)

_____

## ROBERT LESLIE ROBERSON III *v.* TEXAS

ON APPLICATION FOR STAY AND ON PETITION FOR A WRIT OF
CERTIORARI TO THE TEXAS COURT OF CRIMINAL APPEALS

[October 17, 2024]

The application for stay of execution of sentence of death presented to JUSTICE ALITO and by him referred to the Court is denied. The petition for a writ of certiorari is denied.

Statement of JUSTICE SOTOMAYOR respecting the denial of the application for stay of execution and denial of certiorari.

In 2003, a Texas jury convicted Robert Leslie Roberson of murdering his chronically ill infant daughter, Nikki, and sentenced him to death. At trial, the State relied heavily on expert testimony to show that "child physical abuse consistent with the picture of what they call shaken impact syndrome," or shaken baby syndrome, had caused Nikki's death. Tr. 55 (Feb. 3, 2003). At the time, infants exhibiting a triad of symptoms—subdural bleeding, brain swelling, and retinal hemorrhages—were presumed to be victims of child abuse, absent evidence of a major traumatic event such as a car crash. This view went so unquestioned that Roberson's own defense counsel told the jury in his opening statement that this was "unfortunately a shaken baby case," that the evidence would "show that Nikki did suffer injuries that are totally consistent with those applied by rotational forces more commonly known as shaken baby syndrome," and that he would not "tell you that there is just no responsibility here at all." *Id.*, at 57–58.

As the Texas Court of Criminal Appeals (TCCA) has itself

confirmed, the scientific basis for shaken baby syndrome has since been called into significant question. Were the experts at Roberson's trial to testify to the same theory again today, they "would be confronted with twenty years of reputable scientific evidence that contradicts their trial testimony." *Ex parte Andrew Wayne Roark*, No. WR–56,380–03, 2024 WL 4446858, at *26 (Tex. Ct. Crim. App., Oct. 9, 2024). For that reason, the TCCA just this week granted a new trial to Andrew Wayne Roark, a non-capital defendant whose child-abuse conviction rested on the same shaken-baby-syndrome testimony, from the same expert witness, that led to Roberson's conviction. When Roberson sought a stay of execution based on the argument the TCCA credited in *Roark*, the TCCA summarily denied relief.

Roberson now seeks a stay of execution from this Court, but he presents no cognizable federal claim. Meanwhile, mounting evidence suggests that Nikki died from a combination of pneumonia and improperly prescribed medication, that Nikki's severe bruising could well have occurred, at least in part, as a result of her extensive medical procedures at the hospital, and that Roberson (who repeatedly sought emergency medical care for his daughter in the days and hours leading up to her death) committed no crime at all. Because this Court is powerless to act without a colorable federal claim, and because the Texas Board of Pardons and Paroles declined to recommend clemency, only one remedy remains: an executive grant of a reprieve delaying Roberson's execution by thirty days.

## I
### A

In January 2002, Roberson discovered that he was the father of a young child, who had then just turned two and resided with her maternal grandparents. Roberson took custody of Nikki and cared for her together with his par-

ents. Nikki suffered from several serious illnesses, including chronic antibiotic-resistant infections and unexplained "breathing apnea." Pet. App. 208a–210a, 285a, 312a. On January 28, 2002, Roberson and his mother took Nikki to the hospital following five days of vomiting, coughing, and diarrhea; an attending physician prescribed Phenergan, a potent anti-nausea medication, and sent Nikki back home. As Nikki's fever continued to rise, Roberson brought her back to the hospital the next morning. Although Nikki now had a 104.5 degree fever, the attending physicians prescribed Phenergan with Codeine (a cough medication), and again sent Nikki home. The FDA has since warned against prescribing these medications to young children. Phenergan, the FDA warns, "should not be used in pediatric patients less than 2 years of age because of the potential for fatal respiratory depression." Codeine, too, "carr[ies] serious risks, including slowed or difficult breathing and death, which appear to be a greater risk in children younger than 12 years."*

When Roberson woke up the next morning, he found Nikki turning blue and unable to breathe. After attempting to revive her, Roberson called emergency services. He told police that Nikki had fallen out of bed earlier that night, that he had comforted her and sat with her for two hours before falling back asleep, and that he had found her unresponsive when he next woke up. Tr. 170 (Feb. 3, 2003). Over the course of two days, doctors made extensive efforts to treat Nikki, including by surgically affixing a pressure

—————————

*FDA, FDA-Approved Drugs, Phenergan, online at https://www. accessdata.fda.gov/drugsatfda_docs/label/ 2004/07935s030lbl.pdf (last accessed Oct. 17, 2024); FDA, FDA Drug Safety Communication: FDA requires labeling changes for prescription opioid cough and cold medicines to limit their use to adults 18 years and older (Apr. 20, 2017), https://www.fda.gov/drugs/drug-safety-and-availability/fda-drug-safety-communication-fda-restricts-use-prescription-codeine-pain-and-cough-medicines-and (last accessed Oct. 17, 2024).

monitor to the top of her skull. Tragically, these efforts could not save Nikki's life.

Medical personnel diagnosed Nikki with shaken baby syndrome based on the "triad" of symptoms: subdural bleeding, brain swelling, and retinal hemorrhages. An autopsy revealed evidence of internal bleeding near Nikki's brain, as well as extensive bruising on her head, face, and shoulders, leading the doctor who conducted the autopsy to conclude that Nikki had died of "blunt force head injuries." Tr. 55 (Feb. 3, 2003).

Texas charged Roberson with capital murder. At trial, the State repeatedly argued that "Nikki died or . . . was the victim of child physical abuse consistent with the picture of what they call shaken impact syndrome" or shaken baby syndrome. *Id.*, at 54–55. Notwithstanding Roberson's insistence that he was innocent and the abundant evidence that Nikki had been severely ill prior to her death, Roberson's trial counsel conceded that his client had abused Nikki and argued only that Roberson had not intended to kill her. *Id.*, at 60–61.

The State called Dr. Janet Squires as an expert witness to substantiate its theory that Nikki had died of shaken baby syndrome. Dr. Squires testified that Nikki's extensive brain injuries could not have been "explained by a simple impact." Tr. 107 (Feb. 4, 2003). Instead, she said, it was her opinion "that there was some component of shaking that happened to explain all the deep brain injury out of proportion, I would say, to the injury to the skull and the back of the head." *Id.*, at 107–108. Dr. Squires further testified that children can "stop breathing immediately" if "you shake them hard enough and you hurt them bad enough." *Id.*, at 108. Both Dr. Squires and Dr. Urban (the physician who had conducted the autopsy) also testified to the bruising on Nikki's body. Because they examined Nikki only after her treatment at the hospital, however, their testimony left unclear precisely when Nikki sustained these injuries.

See *e.g.*, Tr. 72 (Feb. 5, 2003) (Dr. Urban acknowledging medical treatment could have caused some of the bruising); *id.*, at 96 (similar); *id.*, at 79 (Dr. Urban noting that she was "not prepared to say" bruises on Nikki's arm and foot had been caused by Roberson). In closing, the prosecution relied on this expert testimony to argue again that Nikki died of "shaken baby syndrome" and "shaken impact syndrome." Tr. 25 (Feb. 11, 2003). The jury convicted Roberson and sentenced him to death.

B

In 2016, Roberson filed a habeas petition under a Texas statute that allows a court to grant habeas relief when new scientific evidence casts doubt on a conviction. Tex. Code. Crim. Proc. art. 11.073. In his petition, Roberson presented extensive evidence, including in the form of expert testimony, that the medical community no longer recognized the "triad" as presumptive evidence of child abuse. Expert opinion, rather, supported the conclusion that Nikki's only external injuries were consistent with a short fall from her bed, and that the extensive subdural bleeding found at the autopsy (which led to the conclusion that Nikki had died from blunt force impacts to her head) had in fact been a result of her surgical treatment in the hospital. Further supporting that theory, Roberson presented CAT scans taken of Nikki's head soon after she initially arrived at the hospital, which showed only a very small amount of subdural bleeding.

At an evidentiary hearing, multiple specialists further testified that Nikki's lungs showed severe pneumonia and that she had a toxic level of respiratory-suppressing prescription drugs in her system at the time of her death. Roberson also pointed to the FDA's urgent warnings against the use of Phenergan and Codeine in young children "because of the potential for fatal respiratory depression" (Phenergan) and the serious risk of "slowed or difficult

breathing and death" (Codeine).  In an order that adopted large portions of the State's proposed findings of fact verbatim, the trial court denied Roberson relief.  It found that no "false evidence was presented in regards to" shaken-baby syndrome, and that in any event "no evidence was presented to the jury that shaking alone" had caused Nikki's death.  Pet. App. 177a, 181a.  The trial court's findings did not address the other evidence presented at the evidentiary hearings.  The TCCA summarily affirmed.  App. 4a.

In the years that followed, Roberson retained additional experts who each concluded that Nikki had died of pneumonia and toxic levels of anti-respiratory drugs.  Based on that additional evidence, Roberson filed another state habeas petition, which the TCCA declined to consider on procedural grounds.  This Court denied certiorari.  See 144 S. Ct. 129 (mem.) (Oct. 2, 2023).

C

As Roberson sought to prove his innocence, the parallel case of Andrew Wayne Roark made its way through the Texas courts.  Roark's case involved claims nearly identical to Roberson's, raised under the same provisions of Texas law.  There, as here, the State had argued at trial that Roark "caused the infant victim serious bodily injury by violently shaking her and possibly striking her with or against something, respectively referred to as Shaken Baby Syndrome and Shaken Impact Syndrome." *Ex parte Roark*, 2024 WL 4446858, at *2.  There, as here, the State had relied on expert testimony from Dr. Janet Squires about shaken baby syndrome to secure a conviction.  *Id.*, at *3.  There, as here, the defendant challenged his conviction on the ground that the science underlying the shaken baby syndrome diagnosis had since been discredited.

In a landmark opinion, the TCCA held that, based on current medical science, "there would be a marked shift in testimony today concerning the effect of a short-distance fall

to a child, the effect of shaking a child . . . retinal hemorrhaging, and [shaken baby syndrome] in general as applied to [the victim's] injuries." *Id.*, at \*23. Had Roark been tried on the same theory today, the TCCA explained:

> The [State's] experts would be confronted with twenty years of reputable scientific studies and publications that, if graphed, continually point away from their stated positions. If the expert were to experience the ostrich effect and wish to bury his or her head in the sand, then that expert would have to bear the brunt of a grueling cross-examination. One in which they would be confronted with twenty years of reputable scientific evidence that contradicts their trial testimony.

*Id.*, at \*26. The TCCA thus granted Roark a new trial. *Ibid.*

While *Roark* was pending before the TCCA, Roberson filed a "suggestion for rehearing" with that court seeking reconsideration of its prior decision on his habeas petition, based on the proceedings in *Roark* and on a statement of support from 86 members of the Texas House of Representatives. Pet. App. 492–546a, 547–550a. In that statement, the bipartisan House Criminal Justice Caucus urged the Board of Pardons and Paroles to recommend clemency in light of the "strong evidence of [Roberson's] innocence. *Id.*, at 548a. The representatives further explained that the House had unanimously passed Article 11.073 specifically to allow "challenges to convictions that were based on disproven or incomplete science," and that they were "dismayed to learn that this law has not been applied as intended and has not been a pathway to relief—or even a new trial—for people like Mr. Roberson." *Ibid.* Brian Wharton, the lead detective on Roberson's case, likewise stated that he believed Roberson to be innocent and that clemency would be appropriate. *Id.*, at 549a. Notwithstanding these statements, the Board of Pardons and Paroles declined to recommend clemency.

Before issuing its opinion in *Roark*, the TCCA again denied relief to Roberson without opinion. In a concurrence, Justice Yeary maintained that Roberson's case had not depended exclusively on shaken-baby syndrome evidence because it had also involved evidence of blunt force impacts, suggesting Roberson could have beaten Nikki to death. *Ex parte Roberson*, Nos. WR–63,081–03, 04 (Tex. Crim. App. Oct. 10, 2024) (Yeary, J., concurring in denial of suggestion for reconsideration).

After the TCCA issued *Roark*, Roberson filed a fourth post-conviction petition in light of the TCCA's decision, illustrating in detail that the testimony as to shaken-baby syndrome in *Roark* had been nearly indistinguishable from the testimony in his case. Addressing Justice Yeary's concurrence, Roberson pointed out that the CAT scans taken directly after Nikki's admission to the emergency room showed only minimal subdural bleeding, suggesting that the blunt impact evidence on which Justice Yeary relied could well have been caused by Nikki's subsequent brain surgery, rather than by any injuries she suffered at home. By a 5-4 vote, the TCCA again denied relief.

## II

Current postconviction remedies often fail to correct convictions "secured by what we now know was faulty science." *McCrory* v. *Alabama*, 603 U. S. ___, slip. op., at 1 (2024) (statement of JUSTICE SOTOMAYOR respecting the denial of certiorari). This case is emblematic of that problem. To its credit, Texas has "led the way in forensic science reform in criminal procedure," including by passing the statute that allowed Roberson to challenge his conviction based on changes in forensic science that seriously undermined the integrity of his criminal trial. *Id.*, at 11. Tragically, that statute did not help Roberson in this case.

Roberson now seeks a stay of execution with this Court. Few cases more urgently call for such a remedy than one

where the accused has made a serious showing of actual innocence, as Roberson has here. Yet this Court can grant a stay only if Roberson can show a "significant possibility of success on the merits" of a federal claim. *Hill* v. *McDonough*, 547 U. S. 573, 584 (2006). Roberson did not bring federal claims before the TCCA. Instead, he relied exclusively on Texas's Article 11.073. Before this Court, Roberson's only federal challenge is to the TCCA's practice of issuing "boilerplate opinions dismissing subsequent habeas petitions for purported failure to satisfy" Texas's procedural requirements in habeas cases. Appl. 6. This Court has held, however, that it has "no power to tell state courts how they must write their opinions." *Coleman* v. *Thompson*, 501 U. S. 722, 739 (1991).

Nevertheless, it is notable that the TCCA's decisions in this case do not address the whole of Roberson's evidence of actual innocence. Justice Yeary stated that shaken-baby syndrome was not dispositive at Roberson's trial because the State introduced evidence of bruising and "multiple impacts to Nikki's head." *Ex parte Roberson*, Nos. WR–63,081–03, 04, at 2 (Yeary, J., concurring in denial of suggestion for reconsideration). Yet as Roberson explained to the TCCA, the record reveals that shaken-baby syndrome was the prosecution's core theory throughout the trial. The evidence of bruising to Nikki's head does not change that, for two reasons. First, no court has yet considered the evidence suggesting that the "areas of dense hemorrhage" discovered during Nikki's autopsy, which the examiner took to be signs of blunt force impact, in fact resulted from Nikki's subsequent brain surgery. As already explained, several experts concluded that CAT scans taken shortly after Nikki's admission to the hospital showed only minimal subdural bleeding. Second, the TCCA previously affirmed the habeas court's factual finding that "Dr. Janet Squires . . . *clearly stated* [at trial] that Nikki's injuries *were unlikely* to have been caused by an impact alone," but rather were

caused by shaking and a subsequent impact on a surface such as a mattress. App. 173a (emphases added). Thus, the Texas courts themselves determined that the State's expert had disavowed a beating or impact-only theory of death at trial.

Under these circumstances, a stay permitting examination of Roberson's credible claims of actual innocence is imperative; yet this Court is unable to grant it. That means only one avenue for relief remains open: an executive reprieve. In Texas, as in virtually every other State and the federal government, "[t]he Executive has the power to exercise discretion to grant clemency and affect sentences at any stage after an individual is convicted[.]" *Vandyke* v. *State*, 538 S. W. 3d 561, 581 (Tex. Ct. Crim. App. 2017). Preventing the execution of one who is actually innocent by means of a review "unhampered by legal technicalities" is a core historical purpose of the executive power to grant pardons or reprieves. Christen Jensen, *The Pardoning Power in the American States* 49 (1922); see also *Herrera* v. *Collins*, 506 U. S. 390, 417 (1993) ("History shows that the traditional remedy for claims of innocence based on new evidence, discovered too late in the day to file a new trial motion, has been executive clemency"); *Graham* v. *Texas Bd. of Pardons and Paroles*, 913 S. W. 2d 745, 748 (Tex. Ct. Crim. App. 1996) (same). An executive reprieve of thirty days would provide the Texas Board of Pardons and Paroles with an opportunity to reconsider the evidence of Roberson's actual innocence. That could prevent a miscarriage of justice from occurring: executing a man who has raised credible evidence of actual innocence.